## PULOS v. DENVER & RIO GRANDE RAILROAD COMPANY.

No. 2074.   Decided February 9, 1910 (107 Pac. 241).

1. MASTER AND SERVANT—INJURY TO SERVANT—ASSSUMPTION OF RISK—OBVIOUS DANGERS—CONCURRENT NEGLIGENCE OF MASTER. An employee engaged with a gang of men in loading a flat car with old rails, some of which are crooked, from the ground along the track, assumes the risk of injury from a rail falling off the car after being thrown on, though, because of a direction by the foreman, there were no braces on the car to prevent the rails from falling off, where the danger is as obvious to him as to the foreman. (Page 248.)

2. MASTER AND SERVANT—INJURY TO SERVANT—ASSUMPTION OF RISK—SUFFICIENCY OF EVIDENCE. Evidence *held* to show that the dangers of injury from a rail falling from a flat car after being thrown on in loading were as obvious to plaintiff as to the foreman. (Page 248.)

3. APPEAL AND ERROR—RIGHT TO ALLEGE ERROR—ERROR INDUCED BY PARTY COMPLAINING. Where the jury could properly render a verdict for plaintiff by following either of conflicting instructions, defendant, whose request induced the conflict and caused the error in its favor, cannot complain of the conflict.[1]   (Page 252.)

4. NEW TRIAL—GROUNDS—INSTRUCTIONS—INJURY TO SERVANT—CONFLICT—EVIDENCE TO SUPPORT. In an action for injuries to an employee from a rail falling from a flat car after being thrown on the car in loading, the court instructed generally that defendant is liable for the negligence of "any agent, servant or employee," and then specifically instructed that defendant is not liable for the negligence of its foreman in charge of the work.   There was no claim or evidence of negligence by any person working with plaintiff except the foreman.   *Held*, that a verdict for plaintiff will be set aside, not because of the conflict in the instruction, but because it has no support in the evidence.[2]   (Page 253.)

5. NEW TRIAL—VERDICT CONTRARY TO INSTRUCTION. Where the court instructed that defendant is not liable for the negligence of its foreman, and the evidence shows that, if plaintiff's injury was the result of any negligence, it was that of the foreman, a general verdict for plaintiff will be set aside as contrary to the instruction, and without support in the evidence.   (Page 254.)

1 Wood v. Railroad Co., 28 Utah, 351, 79 Pac. 182.

2 Coates v. Railroad Co., 24 Utah, 304, 67 Pac. 670.

6. New Trial—Grounds—Verdict Contrary to Evidence. A new trial should be granted in such case, as the verdict is without evidence to support it.   (Page 257.)

7. Trial—Taking Pleadings to Jury Room. It is the duty of the court to construe the pleadings and to instruct the jury on the issues; and it is not proper to permit the jury to take the pleadings with them to the jury room unless they have been put in evidence as proof of some fact, and made exhibits in the case. (Page 258.)

Appeal from District Court, Third District; *Hon. M. L. Ritchie*, Judge.

Action by Michael Pulos against the Denver & Rio Grande Railroad Company.

Judgment for plaintiff.   Defendant appeals.

Reversed.

*Van Cott, Allison & Riter* for appellant.

*P. T. Farnsworth, Jr.,* and *O. W. Carlson* for respondent.

STRAUP, C. J.

This is an action brought to recover damages for alleged personal injuries.

The plaintiff, who was an employe of the defendant, was engaged, with others, in loading steel rails on flat cars. While loading a rail it slipped off a car and struck and injured him. The accident occurred in Colorado. The plaintiff alleged that the rails were improperly and negligently piled on the car; that the defendant failed to provide braces on the side of the car; that the foreman of the defendant in charge of the work negligently ordered the plaintiff and others to lift a crooked rail from a ditch and throw it on the car; and that, by reason of conditions occasioned from the manner in which the rails were piled, and the absence of braces, a rail which was thrown on the car slipped off and struck the plaintiff, who, because of a ditch and of a space of

but five feet between the car and a precipitous mountain to the rear of him, could not make his escape after the rail was thrown and before it struck him. He also alleged that in Colorado the doctrine that a master is not responsible for an injury sustained by his servant through the negligence of a mere fellow servant was abrogated by statute, and that under the law of that state the defendant was liable for the injury sustained by the plaintiff, though solely caused by the carelessness or negligence of a mere fellow servant to the same extent and in the same manner as though the injury had been occasioned by the personal negligence of the defendant. The answer contained a general denial and pleas of assumption of risk, contributory negligence, and fellow service. The case was tried to a jury. A verdict was rendered for the plaintiff. The defendant appeals.

The material facts are: The defendant, near Ruby, in Colorado, rebuilt its tract by removing old rails and replacing them with new ones. The old rails, when they were removed, were strung along the track. At the time in question the defendant was engaged in loading the old rails on three flat cars pushed along the tract by an engine operated by a train crew. Two gangs of men, each consisting of about fourteen men, were engaged in loading the rails, one on each side of the car. The plaintiff and the other workmen with him were Greeks. The work was in charge of, and was directed by, a boss or foreman. The gang of fourteen men of which plaintiff was one, with their hands, lifted the rails, one at a time, weighing 650 pounds, and threw them on the cars. Two men on the car with bars placed the rails in position lengthwise the car after they had been thrown on. Other men picked up angle bars and other material which also were thrown on the cars. The foreman gave his orders and directions to an interpreter on the car, who repeated them to the men loading the rails. The rails were strung along the track about thirty feet apart. When the cars were moved to a place where the rails were lying, the men took hold of one of them, and upon a signal given by one of the men, it was raised to the desired position, and then upon

another signal, also given by one of the men, it was thrown on the car. Upon a signal given by the foreman to the conductor, the train was then pushed along where other rails were lying, and the operation repeated. The loading of the rails began in the morning by first loading the car nearest the engine. The middle car was then loaded. The plaintiff was injured between two and three o'clock in the afternoon, and while the men were loading the last car. At places where the surface of the ground was about level with the ties the rails were raised to just below the chin and then thrown. At such places the men loading the rails could easily see them on the car, and observe the manner in which they were placed and adjusted, and, after a rail was thrown on the car, they looked at it until it was adjusted by the men on the car. They then went to another rail. When the men on the car gave the singnal "all right," the men on the ground lifted the rail and threw it. The track generally was straight. The rails loaded on the first two cars were straight. A car load consisted of about 120 rails. When a car was about half loaded, angle bars were placed on the side of the car for braces. That was done when the first two cars were loaded. There was an ample supply of bars for that purpose on the cars. When the plaintiff received his injury, about forty-eight straight rails and three crooked rails had been loaded on the last car. The crooked rails spoken of had but a slight curve, a bulge in the center from an inch to an inch and three-quarters. The forty-eight straight rails were first loaded on the cars and placed lengthwise, and in the center, of the car. Before the crooked rails were loaded, there was then a space of about a foot and a half on the floor of the car between the rails and the side of the car nearest the men loading the rails. At the place where the curved rails were lying there was a ditch, the bottom of which was about two feet below the level of the ties. At the rear of the men there was a precipitious mountain about one hundred feet high. The space between the mountain and the car was about five feet. When the place was reached where the crooked rails were lying, the interpreter suggested to the

37 Utah—16

foreman that the angle bars or braces had better be placed
on the car. The interpreter and some of the men loading
rails also suggested to the foreman that the rails at that
place had better be carried to and loaded from the other
side of the car where there was no ditch and no embankment.
The foreman told the interpreter that it was not neces-
sary to do so; that there were but a few rails at that place;
that, when they were loaded, they would come to a good
place, and to throw them on. The interpreter thereupon
told the men that the boss said "there aren't very many rails
there, just three of them—throw them on." The men
thereupon proceeded to load the rails. Some of the witnesses
testified that the car was about two feet above the heads of
the men loading the rails. The rails were lifted, one at a
time, by the fourteen men, the plaintiff being the fourth
from the end, and were raised above their heads, and then
thrown on the car.

The manner in which they were thus thrown on the car
is best told in the language of the interpreter, who was a
witness, and who testified, in behalf of plaintiff. The man-
terial parts of his testimony on this point, as they appear in
the printed abstract of the record, are: "I saw the first
curved rail thrown up from his (plaintiff's) side. It hit
against the side of the straight rails, and then slid down onto
the vacant space on the floor, which was about a foot and a
half in width. The second curved rail also hit on the side
of the straight rails and slid down. The third curved rail
came up just the same as the other two, and slid down on
top of the other two. It slid down from the straight rails
onto the curved rails and stayed there. There were two men
on top of the car at each end who had forks, and, if the rail
didn't lie good, they would turn it. These men twisted that
third rail and put it with the ball up on top of the two curved
rails lying on the floor of the car. I saw Mike (plaintiff)
and the men with him pick up the fourth curved rail down
in this ditch. The top of the flat car stood about two feet
higher than his head. The last rail thrown was a crooked
rail, the same as the other three. I saw the rail land on the

car. It hit on the side of the straight rails, and then slid down. It didn't stay on the car. The three rails that were thrown just before struck upon the side of the stright rails that were piled along the center of the car and then slid down and into place. The rail that injured the plaintiff hit the side of the straight rails the same as the others, but slid down. There was no place to catch on, no empty place the same as the others. The other three caught the empty space. It struck upon the straight rails at the same place, in the same manner as the former rails that had been thrown up. It slid down one end first and slipped right off the car, because it had no empty place on the car. It hit on the sides and slipped down on top of the others, of the flange of the other rails, and then fell down. The top of the car had been covered by other rails, except ten inches. This is the reason I give why the rail slipped off. There was no difference in the way in which it was thrown. It struck in the same place, in the same way. There were no braces along the side of the car, no obstructions of any kind to prevent rails from slipping off. There were braces, angle bars, on these other cars." When the men threw up "this first crooked rail, they looked at it, but it didn't fall down. It slid down on the car, but not off. It slid down onto the vacant space on the flat car. The men could see this. It stayed there, and they saw the rail stay there. Then they picked up the second crooked rail, and threw it in the same manner. It hit just the same as the first one, and slid down on the floor the same as the first one. I don't know whether the men saw this, because I was standing on the car. But I could see their heads, and I saw the men looking at it. They threw the rail up, and then looked at it. They could see it fall down if they had any place. I didn't see anything because I was standing up. I saw the men looking at it. They threw the rail up, and then stood and looked at it. That second rail slid down and struck the bottom of the car. Two or three before this one did the same. The men stood and watched the second rail all the time the same as they did the first rail. When they threw the third rail, they didn't watch it.

After throwing it, they didn't have anything to do. They waited about a minute until the men with the forks fixed it, and then they picked up the next. They would wait until the men with the forks got through fixing the rail. Then they would know it was ready to go ahead and pick up the next rail when the train moved. When the third crooked rail was thrown, it hit the straight rails and fell down over the two crooked rails, and the men on the ground stood there and watched it. The two men fixed it; and then they moved again. The men would wait until the two men on top of the car fixed the rail before they would move their position. They would stand there watching the two men do their work, and, when they got through, they would move. This had been customary from the time they started in that morning up to the time of the accident. This fourth rail was thrown in just the same manner as the other rails. We had put in about three or four braces on the other two cars that were already loaded. They are put right in holes on the outside of the car, so that the men down on the ground loading the rails can see whether the braces are there or not. They can see because it is outside."

The plaintiff testified: That he had been working for the defendant about sixteen or seventeen days "changing rails," but had never loaded rails before the day he was injured. That the rail which slipped off the car and injured him was thrown on evenly. That at places where the ground was about level with the ties he could plainly see the rails on the cars after they were thrown on, and that the top of the platform of the car was about eight inches below his chin, and that in throwing the rails on the car he took a good look at them. "I saw they were piled on the top of the car. I could see that. When there was a straight track, I could see that," but that in loading the crooked rails he "was not able to see the top of the car, and I did not know how those three (crooked) rails already upon the car were piled," because of the ditch and the car being about two feet above his head. That "we were going to take" the last rail thrown on the car "to the other side because it was easier to throw

the rail up; the ground on the other side being level. We did not take it to the other side because the foreman did not do it. The interpreter told us that the foreman ordered us to throw the rail up from that side;" that the end of the rail which slipped off the car struck him and broke his leg, and that he could not make his escape because of the ditch and the embankment. He testified that men were working on the other side of the car from the time he commenced work in the morning until he got hurt, and, though he saw them moving about on the other side, he did not know what work they did, and did not see, and did not know, whether they threw rails on the cars, or whether they threw any rails on the car on which he loaded rails, and did not remember whether he heard any noise as the rails were thrown on. He further testified that the third curved rail, after it was thrown, struck the rails on the car, but that he did not remember whether it rolled down onto the vacant space, and that he could not see whether the space was still full or empty, and that he did not know whether the third curved rail "stuck or where it went after it was thrown on the car." That after it was thrown he saw the two men on top of the car doing something, but that he could not see from below what they were doing. "I knew that the foreman had those two men there to fix the rails. I didn't know that they were putting the third rail in its position because I couldn't see them. We then moved on to the fourth curved rail and lifted it up. There were no braces on the side of the car at this time. I knew that. After the foreman ordered us to throw it from that side, we threw it onto the car the same as the others. In throwing that fourth rail, we didn't find it very difficult, but we thought it would be better to throw it from the other side, easier to throw it from the other side. We did not, however, find very much difficulty to throw the rail. We were not afraid to throw the rail from the side of the car next to the mountain. We had picked up this rail intending to carry it over to the other side, and the only reason we wanted to do that was that it was a little more advantageous to throw the rail from the river than the

mountain side. None of the fourteen men suggested that it was dangerous to throw the rail from the mountain side, nor did they discuss this. I did not think it was dangerous." The plaintiff also put in evidence chapter 67 of the session Laws of Colorado of 1901, which, and as claimed by plaintiff, entirely abrogated the doctrine that the employer is not responsible for an injury inflicted upon his servant caused by the negligence of a mere fellow servant with the injured servant, and made the employer liable, in such case, for the negligence of any agent, servant, or employe of the employer in the same maner and to the same extent as if the carelessness, omission of duty, or negligence causing the injury was that of the employer. It was conceded by the defendant that the doctrine by such statute was abrogated, but it contended that as a condition precedent to a recovery in such case the injured servant was required to give the employer written notice within sixty days from the occurrence of the accident, and as provided by an act passed and approved in 1893 (Laws 1893, c. 77), being sections 1511a and 1551b, c. 37, Mills' Ann. St., which was put in evidence by the defendant. It was shown that no notice was given the defendant by the plaintiff. Various decisions of the Supreme and district courts of Colorado and the federal courts bearing on the acts in question were also put in evidence, some by the plaintiff, others by the defendant. It was contended by the plaintiff that the act of 1893 was repealed by the act of 1901, and hence the giving of a written notice to the employer was not required in order to render him liable for the negligence of a mere fellow servant. The trial court holding with the plaintiff in such contention in paragraph thirteen of the charge, instructed the jury as follows: "You are instructed that under the laws of the state of Colorado, in which the plaintiff was injured, and in which state his cause of action, if any, arose, if he was in the exercise of due care at the time, his employer would be liable for injuries sustained by him, resulting from the carelessness, omission of duty, or negligence of the employer, or resulting from the carelessness, omission of duty, or negli-

gence of any other agent, servant, or employe of the employer in the same manner and to the same extent as if the carelessness, omission of duty, or negligence, causing the injury was that of the employer." But in paragraph twenty-three of the charge the court also instructed the jury as follows: "If you should find that the acts of negligence upon which the plaintiff relies for a recovery in this case were due solely to the fault of the foreman in charge of the work, and if you should also find that in the prosecution of the work of loading rails on the day in question the principal duty of this foreman was that of superintendence, then you are instructed that this is a complete bar to any recovery in this case. I need not stop to tell you why this is so, it being sufficient for the purposes of this case to say that under the laws of Colorado, where the plaintiff met with his injuries, the plaintiff is precluded from recovering anything on that ground, if you so find the facts from the evidence." In stating the alleged negligence the court charged the jury that "the only acts of negligence alleged against the plaintiff's employer for you to consider are, first, whether the employer negligently failed to provide any braces along the sides of the car; and, second, whether the rails on the car were negligently and improperly piled." The court expressly charged the jury that they could not render a verdict for the plaintiff upon the alleged negligence that the foreman "carelessly and negligently ordered the plaintiff and said other employees to go into the ditch and pick up the curved rail lying therein and while standing in the ditch to throw a curved rail upon the car," and that they could not consider such allegations "as any ground for enabling the plaintiff to recover against the defendant, and, so far as such acts of the foreman in directing the workmen to enter the ditch, pick up, and throw the rail are concerned, there is nothing in those acts to warrant holding the defendant liable to the plaintiff;" and further charged them "that the plaintiff does not claim that the defendant was negligent because it failed to load from the opposite side of the car the rail which fell and broke his leg, and the defendant is

not obliged to meet any such issue, and you are not to consider it."

It is first urged by the appellant that the court erred in giving paragraph thirteen of the charge. The question as to the correctness of that charge involves a construction of the Colorado statute. We find it unnecessary to express an opinion on that subject. Even though it should be held that the trial court in that paragraph gave the statute referred to the proper construction, and correctly ruled that under such statute the giving of a written notice to the defendant by the plaintiff was not essential to render the defendant liable for the negligence of a mere fellow servant with the plaintiff, yet we are also of the opinion that the judgment of the court below must be reversed and set aside because of the views entertained by us on other assignments. We think on the evidence adduced it conclusively appears that the plaintiff assumed the risk, and upon that ground, if not upon others, he was not entitled to recover, and that the defendant's motion to take the case from the jury and to direct a verdict in favor of the defendant ought to have been granted. It, of course, is conceded that the plaintiff assumed the usual and ordinary risks incident to the employment and the extraordinary risks known to and comprehended by him, or which were so open and obvious that he is charged with knowledge and a comprehension of them. The plaintiff was twenty-three years of age, and it must be presumed that he was a man of ordinary intelligence and capacity. He had worked for the defendant sixteen or seventeen days "changing rails." True, he had not engaged in loading rails before the day on which he was injured. But the loading of rails from the ground to flat cars, under the circumstances as disclosed by the evidence, does not involve anything difficult of comprehension. The character of such work is not complex, but is very simple. The risks involved and the dangers to which one may be exposed from a rail slipping or falling as it is lifted from the ground and thrown on the car in the manner and under the circumstances disclosed by the evidence are

not only open and obvious, but incident to the work itself, and easily understood and readily comprehended. That a rail, thrown under such circumstances on other rails upon the car, may not rest and remain in the position, or at the place, where thrown, but may bound or slide, or roll off, is a matter of common knowledge and general experience. Special experience in such work is not necessary to acquire knowledge of the risks incident thereto, or to comprehend the attending dangers arising therefrom. Plaintiff all forenoon and until he was hurt was engaged in loading rails on the cars. He saw and knew the manner in which the work was done and the rails thrown and piled on the cars. He saw and observed this when the first two cars were loaded, and when the forty-eight straight rails were loaded on the third car, and until it was moved to the crooked rails lying in the ditch. At that place he testified, he could not see the top or floor of the car because the surface of the ground where he was standing was about two feet below the level of the ties. But he knew the number of rails on the car and the position and manner in which they had been placed and piled, and that there was a space on the floor of the car where there were no rails, just before the car was moved to the crooked rails. That condition had not changed, but remained just as he saw it and knew it before the car was moved to the crooked rails in the ditch, and before he, with others, undertook to load them. Though at the particular time when the crooked rails were lifted and thrown he could not see the floor of the car, yet from what he had just seen and observed a moment before he well knew the position of the rails on the car on which he was about to throw the crooked rail. He heard the suggestions made to the foreman that the rail be carried to and loaded from the other side, and that braces had better be put up before the crooked rail was loaded. He also testified that he knew that the braces had not been put up. Of course, that was obvious and open to the view of any one situated as was the plaintiff. He further testified that the only reason that the men desired to carry the rail to and load it from the other side was

because it was easier to there throw and load it, and not
that much difficulty was found, or that it was dangerous, to
load it on the side of the car where it was lying. This is not
a case where it may be presumed that the master, because
of his superior knowledge, may, better than the servant,
have comprehended the danger, or where the master had bet-
ter opportunity to ascertain the extent and character of the
danger to which the servant was exposed, or where the serv-
ant might be justified in yielding his own judgment and
deferring to that of his master, or where relying upon prom-
ises, assurances, or representations of the master the servant
was lulled into a sense of security. Though it should be said
that the accident would not have happened had the braces
been put up, and that they were not put up because of the
orders or directions of the foreman, yet the plaintiff well
knew that the braces were not up, and whatever danger was
involved in loading the rails without them was just as read-
ily understood and comprehended by him as by the master.
It is a case where the servant, with the master, had equal
knowledge, and equal means of knowledge, and where the
servant, equally with the master, understood and compre-
hended the dangers and risks involved, and voluntarily un-
dertook the performance of the work. If a court in submit-
ting the case to the jury should inform them that the plain-
tiff assumed the usual and ordinary risks incident to the em-
ployment, and all other risks and dangers of which he had
knowledge and which were appreciated by him, or which were
so obvious and open as to imply knowledge and a compre-
hension of them by him, what disputed fact was there to
submit to the jury for their finding? Should the jury find
that the plaintiff did not know that the braces were not up,
or that he did not appreciate or comprehend that rails
thrown on the pile of rails on the car might bound, or slide,
and, without braces, roll or fall off after they had been
thrown on, such a finding would clearly be against the evi-
dence. And that is just what the jury did in this case.
The court charged them that "if the manner in which the
rails were piled and the absence of braces from the side of

the car were so plain, obvious, and open that the plaintiff, by the use of his faculties of sight and hearing, considering his age, experience, and capacity for acquiring knowledge, ought to have known of their existence, it is the same in point of law as though he actually did know of their existence," and, if he had such or actual knowledge, the plaintiff could not recover. The jury, by their verdict, found that he had no such knowledge, when, by his own testimony, actual knowledge on his part was shown. We are not unmindful of the contention made that the plaintiff, though he knew how the forty-eight straight rails had been placed on the car, he, as testified to by him, did not know and could not see from his position on the ground how the three crooked rails had been piled, and especially that the third had been placed on top of others. The contention necessarily is predicated on the assumption that the danger thus created was unusual, and not incident to the work, and was unknown to the plaintiff. When he threw the crooked rails on the car, he saw that they were thrown on the pile of rails which he testified was from two to three feet high in the center of the car—others testified but a foot or a foot and a half—and that the rails thrown, after striking the pile, rolled down the side of it. That was just as obvious to him as that there were no braces on the side of the car. Though standing in the ditch he could not see a rail lying on the floor of the car, yet he knew that the rails which were thrown at that place, and which slid down the side of the pile, were lying at the side of it either side by side or some on top of others. When the third rail was thrown, the plaintiff saw it strike the pile and slide down. It was just as natural to expect that it would slide, or be placed and rest on the other two rails, as that it might rest on and occupy some of the vacant space of the floor of the car. There was nothing unusual or extraordinary about the occurrence should it have happened either way. Whether it happened one way or the other was an incident to the work itself, and arose from the operation of it. He knew some rails had to be and were piled on others. Whether the three crooked rails were placed side by side on the floor

of the car, or one on top of others, in no way induced or influenced his conduct in throwing the fourth rail and did not affect the manner of doing it. We cannot assent to the conclusion that, if the third rail had been placed by the side of the other two on the floor of the car, the danger of the fourth rail sliding and falling off the car after it was thrown on the pile was a risk assumed by the plaintiff, but that the placing of the third rail on top of the other two created an unusual and extraordinary danger not assumed by him. We think the court erred in refusing the defendant's motion to direct a verdict in its favor, and again erred in refusing to grant a new trial on the ground that the verdict was in the particular stated contrary to the charge, and was not supported by the evidence.

We think that the verdict in other particulars was also clearly against the charge, and was not supported by the evidence. In paragraph thirteen of the charge the court instructed the jury that the defendant was responsible for the negligence of any agent, servant, or employee of the defendant causing the injury to the same extent and in the same manner as if the carelessness or negligence causing the injury had been that of the defendant. But in paragraph twenty-three of the charge the jury were instructed that if the acts of negligence relied on for recovery "were due solely to the fault of the foreman in charge of the work," whose principal duty "was that of superintendence," then no recovery could be had. Whatever might be said in support of the view that the two charges are in conflict, and that the first is right and the second wrong, and that the wrong instruction was induced by the defendant's request and was error in its favor, nevertheless it clearly appears that the court in most positive terms charged the jury that the negligence of the defendant's foreman in charge of the work was "a complete bar to any recovery in this case." If the jury could properly have rendered a verdict for the plaintiff by following either charge, then the defendant, whose request induced the conflict and caused the error in its favor, could not complain of the conflict; for, on well-    3

recognized principles, if the defendant obtained an advantage to which it was not entitled, and when the jury responded even to that demand, the defendant could not be heard to complain of the inconsistency of its own creation. (*Wood v. Railroad Co.*, 28 Utah, 351, 79 Pac. 182; *Reardon v. Railroad Co.*, 114 Mo. 384, 21 S. W. 731.) But suppose a court should charge a jury in a case founded on negligence that the defendant was liable for ordinary negligence, and such was the correct principle of law applicable to the case, and then should also charge the jury on the request of the defendant that no recovery could be had unless the defendant was guilty of wilful and wanton negligence, which was not the law applicable to the case, and a verdcit should nevertheless be rendered for the plaintiff. If, now, there was evidence to support a finding of both ordinary and wilful negligence, the defendant could not complain of the conflict. Though it could not be told whether the jury followed and applied the one or the other charge, yet, if they followed the first, the defendant could not complain because they followed and applied the correct principle; and, if they followed the second, it could not complain because there still was evidence to support the verdict. But if there was a total want of evidence to show willful negligence, the defendant could properly complain because it could not be told whether the jury followed and applied the one or the other charge, and, if the second, there was no evidence to support the verdict. (*Coates v. Railroad Co.*, 24 Utah, 304, 67 Pac. 670.) The proper complaint in such case would not be that there was a conflict in the charge, but that the verdict, in view of the charge, has no support. Now, that is the situation here. The court charged the jury in general terms that the defendant was liable for the negligence of any agent, servant, or employee, in its employ, and then specifically charged them that it was not liable for the negligence of its foreman in charge of the work. It cannot well be said that the jury were authorized to disregard the specific instruction and follow the general one. In view of the charge, the only support which

the verdict, as rendered by the jury, can have on the issue submitted to them in respect of the alleged negligence arising from the manner in which the rails were piled on the car is the evidence of negligence of some agent, servant, or employee of the defendant other than the foreman. We have looked in vain for such evidence. There is no evidence to show, nor is it claimed by the plaintiff, that any one working with him in lifting or throwing the rails was negligent. It is not claimed, nor is it shown, that the interpreter on the car was negligent. It is claimed that the men on the car piling the rails were negligent, but there is not a scintilla of evidence to show such negligence. It is not contended that any of the straight rails were piled improperly or negligently. Nor is it claimed that the first two crooked rails which were thrown on the car were improperly or negligently piled or placed. The contention made is that the third crooked rail thrown on the car was improperly and negligently placed and piled because it was placed on top of the two crooked rails with the ball of the rail up instead of down. In their brief counsel for respondent on this point say: "Had the men who were straightening the rails thrown the third rail over onto the ten-inch space, as they might easily have done with safety, there would have been a level space of about a foot and a half for the fourth rail to fall upon after striking the side of the straight rails. To question that it was the grossest negligence on the part of these men to permit that third rail to remain and to adjust it on top of the two rails, thus providing an incline plane for the fourth rail to slide down over, seems to us to be inconceivable." In no other particular is it contended that the men on the car or that any other agent, servant, or employee of the defendant was negligent. There is nothing to show, except the bare assertion of counsel, that the placing of the two crooked rails side by side and on the bottom of and lengthwise the car, and the third rail on top of those, was improper or negligent. It might as well be said that it was negligent to place one rail on top of others, and that careful conduct required that no more rails should have been placed

on the car than fairly covered the floor of the car. We see no evidence on which to base a claim of negligence that the rails were improperly or negligently piled or placed, or that the men on the car were negligent in any other particular; and since the jury were told that no verdict could be based on the negligent acts of the foreman, and there being a total want of evidence showing negligence on the part of any other servant, agent, or employee of the defendant, there is a total want of evidence to support the verdict upon that issue. Furthermore, there being a total want of evidence to show that the rails were improperly or negligently piled on the car, the court again erred in refusing appellant's motion and request to take that issue from the jury. The court having submitted the case to the jury on both questions of negligence—one in failing to provide the car with braces, the other the manner in which the rails were piled on the car— it cannot be ascertained whether the verdict was rendered on one or both of such questions, or, if rendered on one only, on which one it was founded.

Even though the verdict as rendered was wholly based on the alleged negligence in failing to provide braces on the car, still the verdict, in view of the charge, cannot be upheld. The court submitted the case to the jury entirely on the theory that the alleged commission and omission of acts were servant's not master's acts. True the court stated to the jury that, under the Colorado statute, the employer was liable for his own negligence, and that it was alleged in the complaint that the defendant negligently failed to provide braces; but nowhere in the charge were the jury instructed that a verdict could be rendered against the defendant on the theory that the failure to provide braces or to place them on the car was an omission of master's duties. We do not say that under the evidence adduced the failure to places the braces on the car was an ommission of master's duties. What we do say is that the question of the employer's negligence was not submitted to the jury, and for that reason the verdict which was rendered by them cannot be supported on any such theory. To the contrary, the case

was submitted to the jury entirely on the theory that the failure and omission to place the braces on the car were servant's acts, and the court gave the jury the binding instructions that, if such failure or omission was due to the negligence of the foreman, no recovery could be had; but, in effect, if due to the negligence of some other servant, agent, or employee of the defendant, then the plaintiff could recover, if he was not himself guilty of negligence and had not assumed the risk. We again look in vain for any evidence to show that such failure or omission was due to the negligence of any such servant, agent, or employee. The evidence discloses, without dispute, that there was an ample supply of angle bars, which were used for braces, lying on the car, but that they were not put up because of the orders or directions of the foreman. If the failure and omission to put up the bars under the circumstances constituted negligence, such negligence was the negligence of the foreman. But the court expressly told the jury that the negligence of the foreman in such particular was "a complete bar to any recovery in this case," and failed to submit the case to the jury on the theory as to whether such failure or omission was the employer's negligence. So, even as to that issue, all that the jury had, under the charge, to render a verdict on, was evidence of the negligence of some servant, agent, or employee of the defendant other than the foreman. If the jury based their verdict on supposed evidence of such negligence, then the verdict has no support because there is a total want of such evidence; and, if they based it on evidence of the negligence of the foreman, then it was against the charge. And it cannot be told whether they did the one or did the other. We have no more right to presume that they ignored the specific charge and followed the general charge and based their verdict on evidence of the negligence of the foreman than that they based it on supposed evidence of negligence of some agent, servant, or employee of the defendant other than the foreman. We are not now determining the question of the sufficiency of the evidence to go to the jury on the issue of the alleged negligence in failing

to provide the car with braces. What we do say is that the only evidence of negligence bearing upon such question relates to the acts of the foreman in not permitting the braces to be put up, and, since the court charged that his negligent acts were "a complete bar to a recovery," **6** the verdict, in view of the charge, cannot stand, because it is against the charge and has no support, and ought to have been set aside by the trial court on the defendant's motion for a new trial.

We are also of the opinion that the trial court erred in charging the jury on the issues. The court charged them that "the amended complaint sets forth what the plaintiff claims with reference to the controversy, and the amended answer sets forth the defendant's version thereof. Both these are made a part of these instructions, and you are to refer to them for a particular statement in detail as to what each party alleges with reference to the controversy in question." Following this, the court, after stating in "general terms" the substance of the material allegations of the complaint, and the denials and averments contained in the answer, then also charged the jury: "This brief description of the general nature of the cause of action alleged and the defenses set up thereto is not intended as a substitute for the statements contained in the complaint and answer, nor to relieve you of the necessity of consulting the complaint and answer for your guidance in determining the particular matters alleged as a cause of action or by way of defense." From an inspection of the charge, it does not appear that the amended complaint and amended answer are attached to the charge, nor does the charge itself contain copies of them. But from the language of the court that they were made a part of the charge, and that the jury were required to refer to them to ascertain what was claimed by each party, we must presume, in the absence of anything shown to the contrary, that the court did what is implied by the language employed, and that the amended complaint and amended answer were attached to the charge or that they or copies thereof, were otherwise given the jury to consult and to

refer to; otherwise the language of the court is rendered meaningless and the direction useless.

The charge involves two erroneous statements, one which necessarily implies that the jury had the right to take the pleadings with them to the jury room, and the other that it was their duty to consult them and determine for themselves "the particular matters alleged as a cause of action or by way of defense," and to refer to them to ascertain the "controversy in question." It is the duty of the court to construe pleadings and to charge the jury on the issues. It is not proper to permit the jury to take the pleadings with them to the jury room, unless they have been put in evidence as proof of some fact, and then they are taken, not because they are pleadings, but exhibits. We have no statute permitting the jury to take the pleadings. We see no good purpose to be accomplished by, but much harm to result from, permitting it; for as is said in Brickwood's Sackett on Instructions to Juries, at section 214, "it is not always easy for the court to understand the pleadings, and certainly it would be too much to expect that a jury would not misunderstand them." In this state the court is required to charge the jury in writing upon the law applicable to the case. "What issues are raised by the pleadings," says Mr. Blashfield in his work on Instructions to Juries, section 93, "is a question of law which it is the exclusive province of the court to determine." And the "clear weight of authority is to the effect that it is the province and duty of the court to state specifically to the jury what issues are raised by the pleadings, and that it is erroneous to refer the jury to the pleadings to ascertain for themselves what the issues are; that the construction of the pleadings and the issues raised thereby are questions for the court alone to determine and not for the jury." (11 Ency. Pl. and Pr. 153.) The court in the written charge itself should clearly define the particular issue or issues submitted to the jury, and should specifically state to them the material facts alleged, denied, and admitted in respect of such issues. In doing so the court may state to the jury the subtance of

such material averments and denials contained in the pleadings, or, when clearly and concisely expressed therein, may do so in the language of the pleadings themselves. But the jury to ascertain the issues must look alone to the charge of the court. To charge the jury that the complaint and answer are made a part of the charge, and that the jury must look to them to ascertain and determine the issues, is to require the jury to place their own construction upon the pleadings, and to determine the issues for themselves. And, after the issues are stated to them by the court, to then also charge the jury that such statement as made by the court did not relieve them "of the necessity of consulting the complaint and the answer of your guidance in determining the particular matters alleged as a cause of action or by way of defense," is still more objectionable; for such a charge not only permits, but invites, the jury to disregard the statement of the issues as made by the court, and to determine the issues for themselves upon an inspection and examination of the pleadings. The rule that the jury on questions of law are bound to accept and obey the charge of the court applies to the charge defining the issues as well as to all other instructions of the court on questions of law, and the jury have no license to disregard one more than the other. Instructions similar to those given by the court have frequently been before the courts, and have generally been held erroneous and prejudicial. (1 Brickwood's Sackett, Instructions, section 170; 2 Thompson on Trials, section 2314; 11 Pl. and Pr. p. 153; Blashfield, Instructions to Juries, section 93 *et seq; Keatley v. I. C. R. Co.,* 94 Iowa, 685, 63 N. W. 560.)

For the reasons heretofore given, the judgment of the court below is reversed, and the case remanded for a new trial. The appellant filed a printed brief consisting of 370 pages, including the covers. Our rules provide that the expense of printing abstracts and briefs not to exceed seventy-five cents for each page may be taxed as other costs. If an expense of printing the brief at seventy-five cents a page should be allowed to be taxed as costs, such costs alone would

amount to $276. We think the brief was unnecessarily voluminous, and that the expense thereof should not be allowed as costs. The appellant, however, is entitled to tax costs for the printing of a proper brief. We think a brief of the expense of thirty-five dollars was all that was necessary, and that amount only will be allowed to be taxed as costs for such expense.

The appellant is given all other taxable costs.

FRICK and McCARTY, JJ., concur.