## BRUNER v. McCARTHY et al.

No. 6566.  Decided October 25, 1943.  (142 P. 2d 649.)

400

*Farnsworth & Van Cott, E. C. Jensen,* and *Grant Bagley,* all of Salt Lake City, for appellants.

*Rawlings, Wallace & Black* and *C. E. Henderson,* all of Salt Lake City, for respondent.

WOLFE, Chief Justice.

E. E. Bruner, plaintiff and respondent, who was employed as a hostler's helper on the railroad of the defendants, was injured in the course of his employment. He commenced this action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, to recover damages from his employers for these injuries. The trial resulted in a verdict and judgment in favor of the plaintiff. The defendants appeal.

All assignments of error, except one relating to the admission in evidence of Exhibit G, relate to various instructions given to the jury. By several of the assignments the defendants urge that the jury was not properly instructed on the issue of contributory negligence, which defense was pleaded by the defendants. The Federal Employers' Liability Act provides that:

" * * * the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." 45 U. S. C. A. § 53.

It is contended that the various instructions did not correctly submit this factor to the jury. The plaintiff counters that there was no evidence of contributory negligence and that no such instructions were required. Our first question then is whether there was sufficient evidence of contributory negligence to require the giving of an instruction relating thereto.

The evidence adduced is not in dispute. Prior to the accident the plaintiff had had several years' experience both as a hostler and hostler's helper. On the date of the accident, December 1, 1941, he was working for the defendants as a hostler's helper. He was assigned to aid and assist one Colosimo, a hostler, with whom the plaintiff had not previously worked. Colosimo was in charge and the plaintiff was to perform his work as directed by Colosimo. On this railroad the hostler and his helper serviced locomotives and delivered them from the roundhouse to the railroad crews.

On December 1, 1941, the plaintiff came on shift with Colosimo at 11 p. m. After performing various other duties, they brought Engine No. 1149 out of the roundhouse to the cinder pit. Here employees known as "fire knockers" cleaned the clinkers out of the fire. While they were at the cinder pit, another hostler brought Engine 1182 from the roundhouse and coupled it to Engine 1149. Both engines were facing east. At the cinder pit Colosimo and the plaintiff discussed the future movements of the engines and the work to be done. Engine 1149 did not need sand. It was decided that both engines were to be backed to the sand chute where the plaintiff would take sand on 1182. Then both engines were to be backed to the coal chute. Although it was plaintiff's duty to put coal in the tender of both engines, Colosimo volunteered to coal Engine 1149 and told plaintiff to coal Engine 1182 after he had sanded it. Pursuant to this conversation plaintiff boarded Engine 1182 and Colosimo boarded 1149. Plaintiff gave Colosimo a back up signal and Colosimo testified that he answered with a whistle "back up" signal before starting the engine. By using the power on Engine 1149, both engines were backed toward the sand tower and upon a signal from the plaintiff, 1182 was stopped so that it could be sanded. After plaintiff sanded Engine 1182 he returned to the running board on the side of the engine and gave Colosimo the signal to back the engines toward the coal chute. Engine 1149 which was to be coaled by Colosimo was first spotted at the coal chute—this time it was stopped without a signal from the plaintiff. Colosimo coaled Engine 1149, taking about three or four minutes for the job. While Colosimo coaled Engine 1149, plaintiff, who was still in the cab of Engine 1182, checked the fire and turned off the blower. He then got off the engine on the north side (the side away from the coal chute) and walked to the rear of the engine toward the tender. In order for the plaintiff to take coal on Engine 1182 it was necessary for him to be on top of the tender. There were several methods by which he could have climbed there. At the point where

he was standing at the rear of the north side of the tender there was no ladder leading to the top of the tender. However, immediately across from this point on the rear of the south side of the tender there was such a ladder. To reach this ladder there were at least two direct methods he could have used. One would have been to cross over the pilot (a flat platform on the front of the engine) on Engine 1149. The other, the way he chose to go, was to climb over the draw bar between the two engines which were coupled together. While he was climbing over this draw bar, Colosimo, without warning or without knowing where the plaintiff was or receiving a signal, started the engines. Plaintiff was thrown beneath the wheels of one engine and his left leg was cut off at a point below the knee.

The defendants claim that the plaintiff was guilty of contributory negligence in that of the several ways by which he could have climbed to the top of the tender, he chose the only dangerous one; that the way chosen was not customarily used and was highly dangerous. Defendants also contend that the plaintiff, who was to follow Colosimo's directions, had been ordered by Colosimo to stay on Engine 1182; that if he had obeyed this order he would not have been injured; and that Colosimo had a right to assume that the plaintiff would obey this order. One difficulty with this position is that the record does not support it. There is no testimony tending to show that it was more dangerous to mount the tender in the manner chosen by the plaintiff. Defendants apparently rely on Exhibit 3, which is a picture of these two engines coupled together. This picture shows the draw bar and other items relating to the hand holds, etc., on the route which the plaintiff chose. However, we cannot from this picture conclude that the manner chosen was highly dangerous and a method not customarily used. The evidence merely shows that there were several ways by which the plaintiff could have gotten on top of the tender. The manner in which he was to get there was left to his own judgment. The record does not

show that the way he chose was the more dangerous way. Nor does the evidence show that Colosimo ordered the plaintiff to stay on Engine 1182. True, Colosimo did testify that "I just told him to stay on 1182. That is what I told him, just to stay on 1182, and I would take care of the 1149." But it is clear that what he meant by this was merely that plaintiff should confine his work to 1182 and Colosimo would take care of 1149; for in response to the question: "All you meant by that was that you would take care of 1149 and Bruner would take care of 1182?", Colosimo answered: "Yes, Sir." This interpretation of this statement is further borne out by the remainder of Colosimo's testimony.

We have then this situation: These two men, working together for the first time, were stopping and starting the train according to signals given by the plaintiff. The engines were stopped; Colosimo was putting coal in Engine 1149. It was the plaintiff's duty to get on top of the tender on Engine 1182. He chose a manner of getting there which is not shown by the evidence to be either unusual or dangerous. In fact the only evidence is that which he gave that he had often used this route and that it was a common practice among yardmen to do so. Colosimo, without giving a signal or without knowing where the plaintiff was, started the engines and threw the plaintiff to the tracks and under the wheels of one engine. The plaintiff was doing exactly what he was required to do in the performance of his duties, to wit, getting on top of the tender. While it may be, as defendants argue in their brief, that the manner chosen was highly dangerous, there is no evidence to show this. We must conclude that the record does not show contributory negligence.

Even if there were several means of reaching a point where plaintiff was required to be and one was more safe than the others but all were reasonably safe without movement of the engine and the plaintiff had a right to rely on

the engineer and assume that he would not start the engine until he received a signal, we do not think the choice of the less safe route could be considered as having contributed to the accident when it was apparent that the unexpected jar caused by the engine's movement dislodged the plaintiff. Even had the latter chosen the safest route, a jar which he had a right not to expect, and in regard to such nonexpectation it could be presumed he would have regulated his holds and care of traversal, the dislodgment might have happened. This is a case where the parties were members of a working crew working on signals designed for the very safety of that work. Where the accident has been caused by the failure to give such signal the party working in a crew responsible for such omission will not be heard to say that the injury suffered could have been avoided had the injured party conducted himself on the assumption that the signal would not be given; that the consequences of the delict could have been avoided had the injured party, as appears from hindsight, so conducted or positioned himself as to make the delict inconsequential. There are perhaps few instances of accidents in industry where one party injured by the negligence of another might not, had he been warned of the negligence, have placed himself in more advantageous position to avoid its consequences. One of the criteria in determining the standard of care required in industry to fend off a defense of contributory negligence is not one fashioned by the imagination of judges sitting in their chambers but one measured by the conduct and practices of the average experienced workman engaged in that industry in relation to others working with him in their immediate joint enterprise under the system of signals designed for the safety of such parties engaged in the enterprise. The care which a prudent person will exercise not to injure others and that which he will exercise in order to protect himself from the uncontemplated action of others are not necessarily governed by the same circumstances. One for whose benefit such signal is to be

given may, while in the conduct of the enterprise, rely on the other to give it; and the latter may not, where the other has acted according to the standard set by the accustomed behavior under such mutual undertakings, urge that greater care would have avoided the consequences of his omission to give the signal.

It is admitted by the defendants that certain rules for the operation of trains were put in effect by them, but they argue that these safety rules, which were relied on by the plaintiff to show negligence, were not designed for the protection of employees engaged in operations such as those in which plaintiff and Colosimo were engaged. One of these Safety Rules, Sec. 2057, provided:

"Engine bell or whistle warning must be given before engines are moved, then wait at least one minute."

The other, Sec. 30, provided:

"The bell must be rung when an engine is about to move and while approaching and passing stations, tunnels, snow sheds and public crossing at grade."

This latter section was under consideration recently by the United States Supreme Court in the case of *Owens* v. *Union Pac. R. Co.*, June 14, 1943, 63 S. Ct. 1271, 87 L. Ed. ———. It was there argued that Sec. 30, had no application to the switching operations involved. The majority of the court held that it was unnecessary for them on certiorari to decide this question because it had not been considered by the Court of Appeals. However, three justices dissented on the grounds that the evidence showed "without contradiction that Rule 30 was not applicable to these switching operations and that it was the practice of switching crews under the circumstances of this movement to 'kick' the cars without waiting for a signal from the man in decedent's position at the switch." There is, therefore, considerable

doubt that these rules had any application to the operations undertaken by plaintiff and Colosimo.

It is, however, unnecessary to decide this question ▌ for even without the rules, the evidence conclusively shows negligence on the part of Colosimo. The plaintiff, in outlining the practice followed in operations of this type, stated:

"Whenever it is to be moved they get a proper signal to move and then give the signal to warn anybody that the engine is to be moved, either a whistle or a bell, it is usually the whistle around there. After they get the signal, that is, from the hostler's helper, they will give the proper signal from the engine that is about to be moved.

"Q. Do you know whether or not these signals, both from the hostler to the helper and the helper to the hostler, were used in the movement of the engines in the yard at Grand Junction during the time you were working there? A. Yes, they were in effect, I always used them and worked by them.

"Q. Prior to the time this accident occurred, do you recall any occasion when the signals were not used? A. No, I don't. I always worked according to signals, that is what we have to move by, is signals."

The testimony of Colosimo, who was called by the defendants, also seems to support the view that it was customary to move engines in this type of an operation according to signals between the hostler and the hostler's helper. His testimony shows that after he and the plaintiff discussed the proposed movement of the engines, he boarded 1149 and the plaintiff boarded 1182. He then stated:

"A. After the cinder pit men told me the engine was okeh to go, I got up on 1149 and whistled 'back up' for the cinder pit, to spot 1182 at the sand house. * * *

"Q. When you got down to the sand house what, if anything, took place? A. Mr. Bruner was upon the running-board of 1182, to give a signal to stop at the proper place, to put sand in the 1182. * * *

"Q. Then what was the next thing that happened? A. Mr. Bruner got through sanding the 1149, and gave me a go back signal, to go to the coal chute, which I moved back to the coal chute, and

spotted the 1149, and got out and got up over the tender and put coal in the 1149.

"Q. Prior to the time this accident occurred, do you recall any signal given to you by Mr. Bruner? A. When I spotted, do you mean?

"Q. Yes. A. No, sir."

This evidence is not contradicted. In fact, it would seem that the practice had its birth in necessity. If the crew member operating an engine were to move it without signal from his co-worker when he knew the latter was engaged about the train at a point where he could not be seen, we might expect yard accidents to multiply greatly. There is also no dispute concerning the fact that Colosimo did not get a signal from his helper, the plaintiff, to back up so that 1182 could be coaled; nor did he give a whistle signal. It is also admitted that this sudden start caused the plaintiff to fall to the tracks. The hostler and his helper customarily moved the trains by signals between themselves. Colosimo started the train without either getting a signal from the plaintiff or giving a whistle or bell signal himself. It was dark and he could not see the plaintiff nor did he know where the plaintiff was. Moving the train under these circumstances was negligence even apart from the safety rules. Since the evidence on negligence is such that the court could have directed a verdict for the plaintiff, it was not prejudicial error for the court to give instructions on these safety rules even though said rules may have had no application to this situation.

By the next assignment it is claimed that the court ■ authorized the jury to assess double indemnity by instructing (in part) that:

"You are instructed that if you find the plaintiff is entitled to recover, you may award him such damages not exceeding the sum of $75,000.00 as in your opinion will compensate him for the pecuniary damages proved to have been sustained by him and proximately caused him by the wrong complained of; and in estimating the amount of such damages you may consider the physical and mental pain suffered, if any, the nature, extent, and severity of his injury

or injuries, if any, the extent, degree, and character of his suffering, mental or physical, if any, its duration and its severity, *and the loss of wages and future earnings and impairment of earning capacity, if any, his loss of power and capacity to work, if any, and its effect upon his future.*

"You may also consider whether the injury was temporary in its nature or is permanent in its character, and from all these elements you will resolve what sum will fairly compensate plaintiff for injuries sustained."

It is contended that the portion of the instruction which we have italicized permits the jury to grant double recovery for a single loss; that it permits the jury to consider lost earnings, past and future, in addition to loss of earning capacity and power and capacity to work when the former is necessarily included in the latter.

It would perhaps have been better had the court made it more clear to the jury that these various items covered substantially the same loss and that the plaintiff would be entitled only to that amount which would fairly compensate him for the loss of earnings. However, we do not think that the jury could have been misled by the instruction given. In instruction 9 the jury was told that

"in considering the element of the loss of wages and future earnings, if any, which plaintiff may sustain in the future on account of the loss of his leg, you may * * * consider and determine from the evidence the loss or impairment of plaintiff's earning power, if any, resulting from his injury."

Thus instruction 9 in effect told the jury that loss of wages and future earnings were included in a consideration of impairment of earning power. And further, it does not appear from the instruction quoted above that the jury could have understood that it could assess damages for both loss of wages, past and future, and in addition give damages for impairment of earning power. There was no evidence of impairment of earning power except as reflected in the loss of wages, past and future. It would be attributing to the jury more than ordinary lack of comprehension to assume

that it would find loss of earnings and then on the same evidence double it for impairment of earning power and then perhaps triple it for loss of power or capacity to work. If it had looked around for different evidence to support an additional amount for the latter two phrases it could not have found it. In consequence, it is only common sense to suppose that it would have understood these phrases to be redundant methods of repeating the one measure of damages. The instructions when taken together are not susceptitble of the interpretation contended for by the defendants. While they are not letter perfect, we do not believe that there was prejudicial error in this regard.

The next contention is that the lower court committed prejudicial error in giving instructions on abstract principles of law which were outside the issues and the evidence. Objection is made to that portion of instruction 7 in which the court read to the jury part of the Federal ■ Employers' Liability Act including that part which related to the carriers' liability for injuries resulting from "any defect or insufficiency, due to its [the carriers] negligence in its cars, engines, appliances, machinery, track, roadbed, work boats, wharves or other equipment." Admittedly there were no issues or evidence purporting to deal with defects or insufficiencies. It would have been better had this portion of the instruction been omitted. Yet we do not think that this was prejudicial error. A similar obtion was made in *Kusturin* v. *Chicago & Alton R. Co.*, 209 Ill. App. 55, where the court stated:

"The third instruction given at appellee's request stated the substance of the entire Federal Employers' Liability Act, including provisions therein not involved in this case. We think the portion objected to might well have been omitted, as said by us in a former case, but still we do not think the jury could have been misled to believe that appellee could recover here for any defect in appellant's track or roadbed."

The defendants contend that the jury may have concluded from this instruction that defendants were charged with

negligence in failing to keep their equipment and roadbed in proper condition. It could not so have concluded where there was no evidence remotely showing any such negligence. Moreover, since we have concluded that the evidence shows negligence on the part of the defendants as above demonstrated as a matter of law, we therefore must conclude that there could be no prejudicial error in this regard.

Likewise there was no prejudicial error in instructing the jury on rules of the road even though those rules may have been inapplicable to the issues raised. Such an instruction could have only had the effect of influencing the jury to believe that the defendants were negligent in failing to enforce the rules. Since we have held that the defendants were negligent in other respects as a matter of law, they could not have been prejudiced by this instruction.

The same holds true as to instruction 11 on the "assumption of risk" doctrine. No such issue was raised by the pleadings or the evidence and no good purpose could have been served by the giving of such an instruction. Yet this could not be prejudicial to the defendants, for even if the jury inferred from the giving of such an instruction that the doctrine of "assumption of risk" applied, the defendants could not have been prejudiced. If they had thought that the plaintiff had possibly assumed the risk, it would have been to the defendants' benefit not to their disadvantage or prejudice.

While instruction 16, in which the jury was told that the plaintiff was engaged at the time of the accident in interstate commerce and that the case was therefore governed by Federal rather than State law, may have been unnecessary in that the source of the law was not necessarily a concern of the jury, it could in no way prejudice the defendants. The same is true as to instruction 17 in which the court admonished those jurors who had had previous trial experience in negligence cases to dispel from their minds any and all conceptions that they

may have in respect to the law of negligence because this case was governed by Federal law rather than State law.

The next contention is that the court committed prejudicial error by reading the pleadings to the jury in instruction 1. In instruction No. 2 the jury was told that they were not to regard the statements made in instruction No. 1 as statements of facts proven in the case, but ■ were to take them merely as a general and summarized statement of what the respective parties claim to be the facts. The plaintiff contends that the pleadings were not read verbatim but were merely summarized. Upon examination it appears that instruction 1 so nearly follows the wording of the pleadings that there would have been no substantial difference had the pleadings themselves been read verbatim. If reading the pleadings verbatim would have been prejudicial error we must hold that instruction No. 1 is subject to the same objection. There is nothing inherently erroneous in reading the pleadings in order to present the issues. If they are concise, well drawn and present the issues sharply where there is evidence material to each issue, it may be that the court could not improve upon them as a method of stating the position of each side.

In *Shields* v. *Utah Light & Traction Co.*, 99 Utah 307, 105 P. 2d 347, one of the reasons assigned for reversing a judgment was that the court had read a long and involved pleading to the jury when there was no evidence to support some of the allegations made in the pleadings. One justice concurred outright in this reasoning; two concurred only in the results; and one dissented from the holding that it was prejudicial error. The case, therefore, is not controlling.

In the earlier case of *Davis* v. *Heiner,* 54 Utah 428, 181 P. 587, 591, by a divided court, we held that merely reading a "verbatim statement of the complaint, answer, and reply is not such a statement of the issues as the law contemplates and may be misleading and prejudicial." We also stated:

"The better practice in all cases is for the trial court to make a plain and concise statement in its own language of the issues to be deter-

mined by the jury, carefully omitting any and all issues that may have been eliminated by the parties themselves or the court during or before the trial. But it does not necessarily follow that the losing party has been prejudiced simply because the trial court copied in his instructions and read to the jury the pleadings in the case instead of a statement of the issues in the language of the court."

Again in *Farmers' & Merchants' Sav. Bank* v. 10, 11 *Jensen,* 64 Utah 609, 232 P. 1084, 1086, we affirmed this rule and held that:

"The court in the written charge should itself clearly define the particular issue or issues submitted to the jury, and should specifically state to them the material facts alleged, denied, and admitted in respect of such issues. Pulos v. Denver & R. G. Railroad Co., 37 Utah 238, 107 P. 241, Ann. Cas. 1912C, 218. But upon appeal prejudice will not be presumed simply from a showing that the trial court failed to construe the pleadings and to charge the jury upon the issues. The burden rests upon the complaining party to go further and point out to this court wherein and in what respect he has been prejudiced by such error on the part of the trial court. Davis v. Heiner, 54 Utah 428, 181 P. 587."

While most jurisdictions frown on the practice of using the language of the various pleadings to summarize the issues for the jury, the rule that reading the pleadings may or may not be error seems to meet with general approval. See *Holt* v. *Mundell,* 107 Colo. 373, 112 P. 2d 1039; *Balono* v. *Nafziger,* 137 Kan. 513, 21 P. 2d 896; *Rhodes* v. *Lamar,* 145 Okl. 223, 292 P. 335; *Robinson* v. *Ebert,* 180 Wash. 387, 30 P. 2d 992.

It has been held prejudicial error to read parts of pleadings relating to issues upon which no evidence has been introduced. *Hines* v. *Gale,* 25 Ariz. 65, 213 P. 395. It is argued here that the pleadings read to the jury referred to the two safety rules concerning warning ■ signals and that there was no evidence to show that these rules applied to this situation. However, our holding that even without the rules the plaintiff as a matter of law proved negligence, answers any contention that the defendants were prejudiced by such an instruction.

And last, defendants contend that it was error to admit exhibit G in evidence. This exhibit was compiled by a witness who qualified as an expert. It was compiled from Annuity Tables by McKenzie. The tables themselves would have been admissible in evidence along with Mortality and Annuity Tables. The witness merely from these tables, compiled various figures to show what amount of money it would be necessary to invest at various interest rates at the present time to pay to an individual $1,200 per year, $1,800 per year, and $2,400 per year for thirty-five years. Since the various tables from which the witness took his data would have been admitted in evidence, we see no objection in having this witness prepare computations from these tables by way of summary. There is no contention that these figures so prepared were inaccurate or that the witness who prepared and explained them was not competent to do so.

There is no prejudicial error in the lower court's proceedings. Judgment affirmed. Costs to respondent.

LARSON, Justice (concurring in part, dissenting in part).

I concur in that part of the opinion holding that under the evidence, defendants were guilty of negligence which proximately contributed to the accident.

I dissent from that part of the opinion holding that as a matter of law plaintiff was not guilty of contributory negligence. As I read the evidence and the authorities, the question of contributory negligence on the part of plaintiff was a question for the jury. At this point we note some interesting facts in connection with the court's instructions to the jury. In instruction number 6, the court told the jury that none of the things plaintiff did could constitute negligence, which has the effect of saying that the question of plaintiff's contributory negligence was not to be considered by by the jury. I think this instruction was error.

But after so instructing, the court gave instruction No. 15, wherein he told the jury that if plaintiff was guilty of contributory negligence it must reduce the amount awarded plaintiff in proportion to the amount of negligence of the plaintiff. This was clearly not in harmony with instruction 6 and one or the other should not have been given. But furthermore, with instruction 15 given, it would be incumbent upon the court to define contributory negligence to the jury. The judgment roll discloses that defendants submitted to the court a requested instruction properly defining contributory negligence. This requested instruction appears in the file, endorsed by the judge as "Given," but it is not found in form or substance in the charge as read to the jury. No exception to the failure of the court to give this request No. 5 was taken, perhaps because when the court endorsed the request as "given," counsel assumed the court had given it. Clearly when instruction 15 was given, defendants' request No. 5 should have been given to enable the jury to apply instruction No. 15 intelligently.

Plaintiff argues that in fact the question of contributory negligence was submitted to the jury by instruction 15, which in effect told the jury to reduce any award in proportion to plaintiff's negligence, if he was contributorily negligent. But since the court did not define contributory negligence, and told the jury in instruction 6 that plaintiff was not negligent in anything he did, or did not do, such argument fails. For the reason given I think the judgment should be reversed.

MOFFAT, Justice (dissenting).

I dissent. I think the evidence does not establish negligence as a matter of law.