MISSOURI PACIFIC RAILROAD COMPANY *v.*
James Cleborn BALLARD

5-5597 469 S. W. 2d 72

Opinion delivered June 28, 1971

*William J. Smith, Boyce R. Love* and *Frederick S. Ursery,* for appellant.

*Howell, Price, Howell & Barron,* for appellee.

J. FRED JONES, Justice. James Cleborn Ballard was injured while in the course of his employment as a switchman for the Missouri Pacific Railroad Company when he was struck by an automobile being driven by a Mr. Pack on a service road in the Missouri Pacific yards in North Little Rock. He filed suit in the Pulaski County Circuit Court against Pack and the railroad company, charging Pack with common law negligence and charging Missouri Pacific with negligence under the Federal Employers' Liability Act (45 U. S. C. A. § 51 et seq.). Both defendants pleaded Ballard's own negligence as a bar to recovery, and the issues of negligence were submitted to the jury on interrogatories. The jury apportioned the negligence as 10% to Ballard, 10% to Pack and 80% to Missouri Pacific. It found that Ballard had sustained damages in the amount of $35,000 as a proximate result of the combined negligence. Judgment on the verdict was rendered against Missouri Pacific for $31,500 and on appeal to this court Missouri Pacific relies on the following points for reversal:

> "The court was in error in failing to direct a verdict for the Missouri Pacific Railroad Company at the close of the plaintiff's case and at the close of all the evidence.

The verdict is not supported by substantial evidence.

The court was in error in giving AMI 305 among its instructions to the jury.

The court was in error in giving AMI 1909 among its instructions to the jury."

The facts as we gather them from the record are as follows: Mr. Ballard was injured about midnight on September 4, 1966. There were three individuals involved in connection with the incident resulting in the injuries—Mr. Ballard, Mr. Pack and Mr. Thurman. All three were employees of Missouri Pacific and were the only eye witnesses to the occurrence resulting in the injuries. Mr. Ballard was a switchman in the transportation department and was engaged in his duties as such when he was injured. The defendant Pack was a locomotive engineer and was on his way to work when Mr. Ballard was injured, and Mr. Thurman was a rip track foreman in charge of repairing damaged railroad cars when they were placed on the rip track for that purpose. The rip track, where cars were repaired, was laid out in a north-south direction and was protected at each end against careless switching operations by switches locked with blue colored locks. Only Mr. Thurman, and car repair personnel under his supervision, carried keys to blue locks and they were the only ones who had authority to open the switches into the rip track; regular switchmen or transportation personnel had no such authority.

An access road with asphalt surface about 18 or 20 feet wide ran near, and parallel to, the rip track. It was designed and used for motor vehicular traffic by employees going to and from their work at various places in the railroad yard. On the night in question, the switching crew with which Mr. Ballard was working was directed by the yard master to switch approximately 45 railroad cars into the north end of the rip track. Upon arriving at the north end of the rip track, they found the rip track switch closed with the blue lock, so they were then directed to take the cars

into the rip track from the south end. In the meantime, and while the switch engines and crew were on their way to the south end of the rip track with the cars, Mr. Thurman, the rip track foreman, was directed by the yard master to open the switches into the rip track by removing the blue locks at both ends of the rip track. Mr. Thurman drove in his automobile to the north end of the rip track and opened the switch at that point. He then drove to the south end of the rip track where he found the switch crew in the process of taking the cars through a regular switch adjacent to the access road; after which, that switch would be thrown and the cars would be shuttled back onto the rip track, through the nearby rip track switch. Mr. Ballard was attending the switch through which the cars were passing and about five of the cars had passed through the switch when Mr. Thurman arrived in his automobile headed south on the access road. Mr. Ballard was standing an undisclosed distance from the switch and an undisclosed distance from the access road, but he had his back to the access road and was watching the cars pass through the switch which he was to realign after the cars had passed through. Mr. Thurman stopped his automobile across the access road from Mr. Ballard. He called from his automobile to Mr. Ballard and inquired as to whether the nearby rip track switch was open. There is a slight conflict in the testimony of Mr. Ballard and that of Mr. Thurman as to the exact details of what happened at this point; but, in any event, Mr. Pack, who was driving his automobile north on the access road, struck and injured Mr. Ballard.

Mr. Ballard's original complaint alleged negligence on the part of Pack in driving at an excessive rate of speed; in failure to keep a proper lookout; in failing to keep his vehicle under proper control; and in driving although afflicted with poor eyesight. The original complaint as amended alleged negligence on the part of Missouri Pacific in failing to provide Mr. Ballard with a reasonably safe place in which to work, and in requiring Mr. Ballard to go to the service road to receive instructions from Mr. Thurman. A second amendment to the complaint against Missouri Pacific alleged

that Thurman was a fellow-employee of Ballard's and that his negligence was imputable to Missouri Pacific; that Thurman, as a superior of Ballard, called Ballard over to the edge of the road where he was struck by an automobile; that Thurman as agent for Missouri Pacific, was negligent in enticing Ballard to enter a place of danger in the course of his work; and in failing to warn Ballard of the approach of a motor vehicle which presented danger to his person and in sitting silently by while observing an automobile bearing down on his person and in otherwise failing to observe ordinary care under the circumstances.

Mr. Pack answered by general denial and alleged that the injuries to Ballard were proximately caused, or contributed to, by his own negligence, or resulted from a risk assumed by him; and that in so far as Pack was concerned the accident was an unavoidable mishap.

Missouri Pacific answered by general denial and alleged that Ballard's injuries were proximately caused by his own negligence or his contributory negligence and the negligence of Mr. Pack. In answer to the second amendment to Ballard's compalint, Missouri Pacific, in addition to repleading the matter set out in its original answer, further pleaded the doctrine of assumption of risk.

Approaching the points relied on in reverse order, we are of the opinion that the trial court did not err in giving AMI 1909 among its instructions to the jury. AMI 1909, as given by the trial court, is as follows:

> "At the time of the occurrence, there was in force a Federal statute which provided that in any action brought against a railroad to recover damages for injury to an employee, the employee shall not be held to have assumed the risks of his employment in any case where the injury resulted in whole or in part from the negligence of any of the officers, agents or employees of the railroad."

Missouri Pacific as well as Pack definitely and affirmatively pleaded assumption of risk and although

neither requested an instruction on assumption of risk, the evidence as presented constituted very potent factors of assumed risk. Although the trial court failed to define "assumed risk" for the jury, we are of the opinion that the giving of instruction AMI 1909 was not reversible error under the facts and circumstances of this case. In the Committee comment as to the use of this instruction is found the following: "Giving an instruction that the employee has not assumed the risk of his employment has been sustained without regard to whether the defense has been asserted. *Wantland* v. *Illinois Central R. Co.,* 237 F. 2d 921." (See also *Larsen* v. *Chicago & N.W. R. Co.,* 171 F. 2d 841).

As to Missouri Pacific's third point, AMI 305, as given by the trial court, is as follows:

"It was the duty of all persons involved in the occurrence to use ordinary care for their own safety and the safety of others."

This instruction as given was in the exact wording of the Model Jury Instruction 305B as approved by this court. As set out in the Committee comment, this instruction is designed for use when negligence on the part of the plaintiff is an issue, or when the jury is to consider a counterclaim or multi-party suit. This instruction was preceded by AMI 303 as follows:

"A failure to exercise ordinary care is negligence. When I use the words 'ordinary care,' I mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence in this case. It is for you to decide how a reasonably careful person would act under those circumstances."

It was Ballard's contention that Thurman was an agent for Missouri Pacific; that his negligence in calling Mr. Ballard from his position of safety into the unsafe highway, and in failing to warn him of impending danger was a proximate cause of Ballard's injuries and

damage; and that such negligence was imputed to Missouri Pacific. Mr. Ballard, Mr. Pack and Mr. Thurman were the only persons involved in the occurrence and each of them was charged with negligence. We find no error in giving instruction AMI 305 under the circumstances of this case.

Missouri Pacific's assignments under its second and first points are closely related and have given us considerable difficulty. Recognizing that every case of negligence must turn on its own particular facts, we find it necessary to set out the facts in this case as well as the facts in similar Federal decisions in much greater length and detail than would be necessary if this were a simple common law negligence case to be decided under state law and decisions, rather than the Federal Employers' Liability Act as interpreted and applied by the Federal Courts.

The situation in the case at bar is similar to the one presented in *Missouri Pacific R. Co.* v. *Eubanks,* 212 Ark. 652, 207 S. W. 2d 610, where (substituting Mr. Pack for Mrs. Keene) we said:

"The suit was brought to compensate a single injury against two defendants having no relation to each other, and different rules are applicable in determining their respective liability. The suit against Mrs. Keene [Mr. Pack] is determinable by the laws of this state, but our state laws are not determinative of the liability of the railroad company. As against the railroad company the Federal Employers' Liability Act governs and as said in the case of *St. L. S. F. Ry. Co.* v. *Smith, supra,* 'the question as to the sufficiency of the evidence to establish negligence must be determined by that act and the applicable principles of the common law as construed by the federal courts.' "

The dissenting opinion in *Eubanks* further points up the problem before us by citing from Federal Court decision the following language:

" 'The focal point of judicial review is the reasonableness of the particular inferences or conclusion drawn by the jury. It is the jury, not the court, which is the fact finding body . . .'

\* \* \*

. . . Under the old concept of proximate cause, that cause must have been direct, the complete, the responsible, the efficient cause of the injury. Contributing and remotely related causes were not sufficient. Now, [under F. E. L. A.] if the negligence of the railroad has 'causal' relation,—if the injury or death resulted *'in part'* from defendant's negligence, there is liability.

The words 'in part' have enlarged the field or scope of proximate causes—in these railroad injury cases. These words suggest that there may be a plurality of causes, each of which is sufficient to permit a jury to assess a liability. If a cause may create liability, even though it be but a partial cause, it would seem that such partial cause may be a producer of a later cause. For instance, the cause may be the first acting cause which sets in motion the second cause which was the immediate, the direct cause of the accident."

Returning now to the evidence of Missouri Pacific's negligence through Mr. Thurman; he was directed to open the switch at the south end of the rip track. He testified as follows:

"Q. When you drove up there, he had his back toward you and let me ask you this, this train is in motion down on this 311 rail, wasn't it?

A. Yes, sir, it was.

Q. And he had his back over here towards your car and he was facing the train and facing the switch that he is going to throw when it passed?

A. Yes, sir.

Q. To your knowledge, was there any reason for him to leave his position there by the switch prior to your coming up there?

A. No, not to my knowledge.

Q. All right. Now, he did leave that position there by the switch, did he not?.

A. Yes, sir.

Q. What distracted his attention away from the train and caused him to draw nearer to you?

A. I called to him across the road and spoke to him and asked him if the switch was unlocked.

Q. Was this train making noise moving by?

A. Making a little noise.

Q. All right. Now, what did he do?

A. When I asked him the question?

Q. Yes.

A. He made a motion backwards and answered me, yes.

Q. When you say he made a motion backwards, he took a step backwards?

A. As near as I can remember, yes, sir, took kind of a step backwards.

Q. Took a step back and . . .

A. And he was . . .

Q. And in which direction did he turn?

A. He was turning his head from left to right and at the time he answered me, his head was to the left.

Q. Turning his head from left to right, turning his head to the left?

A. And to the right, watching his cars.

Q. Well, he turned to the left to get to facing toward you, did he not?

A. Yes, sir.

Q. And then back over here to where the train was running? He moved himself in a position to where his back was toward an oncoming car that we are going to talk about in just a minute, isn't that true?

A. I don't recall his back being turned completely towards the oncoming car, his back was to the road.

Q. That was where he was positioned originally?

A. Right.

Q. His position originally?

A. Yes, sir.

Q. But when you called him, he made a turn to the left, he made a turn around this way to where his back was then facing in this direction?

A. I don't recall him turning completely around.

Q. Well, partially around.

A. Yes, sir.

Q. The point still being that he had turned away from the direction this car was coming from?

A. Partially, yes, sir.

Q. All right. Now, at the time you drove up there, stopped your vehicle, and at the time you called him, were you aware of an automobile approaching from the south going north?

A. Yes, sir.

Q. Did you see it?

A. Yes, sir.

Q. Did you know it was coming?

A. Yes, sir.

Q. Were you parked on the road or off the road?

A. Partially off and on.

Q. You were partly on the road?

A. Yes, sir.

Q. And partly off the road.

A. Mostly off the road.

Q. Why didn't you park completely off the road?

A. It just didn't occur to me to pull completely off the road, I was only going to be there a second.

Q. Is this a wide road out there?

A. No, sir.

Q. It's a right narrow road, isn't it?

A. Yes, sir.

Q. Did you turn your lights off?

A. Beg your pardon?

Q. Did you turn your lights off?

A. No, sir.

Q. Did you turn them down to dim?

A. They were on dim.

Q. Now, let's get back to Mr. Ballard. You've described to the jury that he's got his back towards you, looking at the switch and the train going by him and he takes a step backward and turns partially to the left to where he can speak kind of directly to you, that's what happened wasn't it?

A. Yes, sir.

Q. And you said what?

A. I asked him if the switch was unlocked.

Q. What did he say?

A. He said yes.

Q. What did he do then?

A. He started moving back towards his switch.

Q. How far did he ever get onto that road from the time he made a step back until the time he started moving back toward his switch?

A. I don't remember him ever getting more than one foot on the road.

Q. You saying to the jury that he never got more than a twelve inch distance on the edge of that road?

A. Something in that proximity, one leg.

Q. And his only time on that road was to step back up here and answer your question, to say yes, and immediately move away?

A. It wasn't necessary for him to come up on the road to answer me.

Q. I didn't ask you that. I didn't ask you that. I asked you did he move one step back and answered your question and immediately moved back to that switch.

A. Yes, sir.

Q. And all the time you knew Mr. Pack's car was coming down the road because you had seen it and been watching it, hadn't you?

A. Yes, sir.

Q. Did you ever, at any time, give any warning to Mr. Ballard that this car was approaching from the back, from his back side at a place where you were partially on that highway, did you ever at any time give him any warning of the approach of that car?

A. No, sir."

Mr. Thurman testified that there were several telephone poles between the railroad track and the service road on which he was parked but that, in his opinion, the roadway was well lighted and one would have to be looking for shadows of poles in order to find them.

On cross-examination Mr. Thurman testified that when he brought his automobile to a stop, he noticed Mr. Pack's automobile lights approaching from about a mile away; that he simply called to Mr. Ballard and asked "is that switch unlocked?" and that Mr. Ballard was backing up toward him and replied, "yes it is," and about that time Mr. Pack's automobile struck Mr. Ballard. Mr. Thurman testified that the service road on which he had parked his car had a blacktop surface and was about 18 or 20 feet wide; he says that the railroad track runs parallel with the road at this point, and that the telephone poles, referred to in his direct examination, were between the track and the service road about eight feet from the edge of the pavement. He says that Mr. Ballard was holding his signal lantern in his right hand while he was facing the railroad track and that Mr. Pack's automobile approached him from the right side.

On cross-examination Mr. Thurman was asked why he did not tell Mr. Ballard about the approaching automobile and he answered that he felt certain that Mr. Ballard had seen the automobile, and that he did not think that Mr. Ballard was in any danger from the approaching automobile. He denied that he was Mr. Ballard's superior and testified that he and Mr. Ballard were not acquainted with each other.

Mr. Ballard testified that he alighted from one of the engines pulling the freight cars and was standing near the switch waiting for the cars to pass through. He testified that he was facing the tracks with his back to the service road and intended to realign the switch as soon as the cars passed through so that the cars could then be shuttled back onto the rip track through the switch at the south end of the rip track. He says that the cars were moving through the switch immediately in front of him and that his first knowledge that Mr. Thurman was in the vicinity was when he heard someone say something to him from behind. Then Mr. Ballard testified on direct examination as follows:

"Q. Now, with this train and the noise that it was making as you were standing there, did you know Mr. Thurman at the time he called you?

A. When I turned around and seen him, I didn't know what his name was, but I know that he was with the Car Department, yes, sir.

Q. Why did you move backward from near that switch onto the edge of the road?

A. Because I didn't understand what Mr. Thurman said.

Q. Because of what?

A. Because of the noise of the cars.

Q. As you moved back there, what did he say to you?

A. He asked me was the switch locked?

Q. What did you tell him?

A. I told him I didn't know and I turned to go see.

Q. Did you turn immediately?

A. Yes, sir.

Q. I know you don't go out there and time these movements, but was there any appreciable time at all that it took you from the time he hollered to you and the time you moved closer to him to hear what he had to say and then give him an answer and moving back. Was there any more time lapse than that?

A. No, sir.

Q. Now, are you all supposed to be out there, I'm talking about out there in the yards at these switches?

A. Yes, sir.

Q. Were you doing what you were supposed to be doing?

A. Yes, sir, the best I knew how."

Mr. Ballard testified that on some occasions it is necessary for a switchman to get out into the service road to conduct his switching duties, but that this is only necessary on a long string of cars when the engineer on the engine, is around a curve where he cannot see the signals when given from nearer the track. He testified that the service road where the accident occurred is used by the employees of the railroad company and their families in driving to and from work. Mr. Ballard then continued as follows:

"Q. Did you ever see Mr. Pack's car coming down the road?

A. No, I didn't.

Q. Tell the jury how far you ever got out off of that road.

A. Well, I don't even remember putting my foot on the road, I thought I just went out . . . the best I remember, I just went out to the edge of the road as far as I went, I could have had one foot on it, I wouldn't argue the point, I don't know, but as far as my own knowledge, I don't even remember stepping a foot on the pavement, I thought I was on the shoulder of the road.

Q. Now, with reference to these light poles and with reference to the lights and poles they had in the yard, describe, if you will

for the jury, this matter, if it be so, of shadows and lights out there.

A. Well, sir, you have some places there that the road has sufficient lights and then there's places that it has shadows.

Q. Does this actually vary from day to day with reference to boxcars and with reference to telephone poles . . . I know the telephones don't, but the boxcars move.

A. Oh, yes sir, I would say it will vary, depending on how many cars you have in the yard, if they are hopper cars or boxcars or what have you.

Q. What was the first thing that you knew with reference to Mr. Pack's vehicle?

A. The first thing I heard was just brakes squalling and then just bam, that was it.

Q. Was it almost that close together?

A. Yes, sir.

Q. Were you, at the time, moving away from the road back towards the switch?

A. Yes, sir to the best of my knowledge, I was headed back to see if the switch was locked where I could tell Mr. Thurman whether it was locked or not.

Q. As far as you know, you were not even on the road at the time?

A. As far as I know, I was not."

On cross-examination Mr. Ballard testified that he weighed around 230 pounds and he then testified as follows:

"Q. Where this accident happened, Mr. Ballard, in 1966, do you agree with me that a man standing on the edge of the road where you were, if he looked, could see close to a mile down that road around that curve, cars approaching from the south?

A. No, no, sir, I don't think you could see that far.

Q. All right, how far would you say that you could see a car?

A. 'Tween a quarter and a half of a mile.

Q. You would say you could see a car coming from the south, the direction from which Mr. Pack was coming, for a distance of about a quarter to a half of a mile?

A. Yes, sir.

Q. All right, sir. Now, on the night this happened, you never did see Mr. Pack's car?

A. No, sir, I never did.

Q. You do know better than to step out into a road without looking both ways, do you not?

A. Yes, sir.

Q. Did you look both ways?

A. Yes, sir.

Q. You did look toward the direction from which Mr. Pack was coming?

A. Yes, sir.

Q. But you didn't see him?

A. No, sir.

Q. Do you agree with me that once you get past the poles, which are approximately eight feet to the east of the pavement, once you get on the pavement side of the poles, that there's nothing to prevent you from seeing a car that was coming from the direction from which Mr. Pack's car was coming?

A. There's no obstruction, no, sir.

Q. Coming from the switch toward the pavement, once you walked by the poles, there's nothing to prevent you from seeing Mr. Pack's car coming from the south?

A. There's nothing.

Q. Sir?

A. There's no poles or obstacles, no, sir.

Q. Did you look in Mr. Pack's direction after you passed the poles?

A. I don't know. To tell you the truth, I don't know.

Q. You may have looked...

A. I may have looked.

Q. Before you passed the poles?

A. I may have looked before, I wouldn't swear to it, but I think I looked after I got past the poles, I'm not for sure, I wouldn't swear to it.

Q. All right, sir. You do know that cars travel up and down that road?

A. Yes, sir.

Q. When you were working, you probably went back and forth to work over that road, didn't you?

A. Yes, sir.

Q. Did you not?

A. Yes, sir.

Q. All right, sir. And at shift change time, I guess there are a number of cars on that road?

A. Yes.

Q. Was this about shift change time, Midnight?

A. Well, yes, sir, it was pretty close to shift change.

Q. When this happened, am I correct that there are about five boxcars that had gone by you and you were waiting for forty more to go by before you were going to throw that switch?

A. Approximately, somewhere there abouts.

Q. You were going to wait there by the switch for about forty cars to go by?

A. Yes, sir.

Q. Now, I didn't hear you say, but Mr. Price demonstrated and you agreed with him, as to how this happened. He showed you standing facing the train, backing towards Mr. Thurman and going back towards the train. Is that the way it happened?

A. No, sir.

Q. How did it happen?

A. The best I remember, when I heard Mr. Thurman's voice, I turned and seen him sitting in his automobile, I turned and walked to the road, at no time did I back or I would remember backing up.

Q. It's your recollection that as you approached the road, you were facing it?

A. Yes, sir.

Q. All right, and that you looked left and right?

A. Yes, sir.

Q. And you were carrying a lantern, were you not?

A. Yes, sir.

Q. Do you agree that a lantern of the type you were carrying can be seen if you are holding it down?

A. Yes, sir, it can be seen . . . well, it all depends on which side you are holding it on whether it could have been seen from which side or not.

Q. Assuming there was nothing in the way, if you hold the lantern out here, holding it down, it can be seen from the side?

A. Yes, sir, unless the light is down by your leg and you are coming from the other side.

\* \* \*

Q. As far as you recall, you may have been

hit off the pavement, is that what you said?

A. I could have, I don't ever remember putting my foot on the pavement. I could have had one on it, I said I wouldn't swear to it, I don't know whether I had one foot on or they was both on the shoulder or what.

Q. As far as you are concerned, Mr. Pack may have hit you off the pavement?

A. As far as I know, I did not have both feet on the pavement, I could have had one on the pavement, I don't know."

Mr. Pack testified that the speed limit posted inside the Missouri Pacific shop area is 30 miles per hour and that he was traveling to work on the night in question at about 25 miles per hour. He testified that as he approached the scene of the accident, he saw the headlights of Mr. Thurman's vehicle parked on his left-hand side of the service road. He testified that he slowed down a little bit when he saw the parked automobile and he then testified as follows:

"Q. What happened then, sir?

A. Then all at once, an object appeared in front of me, just like that, looked about a car length.

Q. What was this object?

A. Well, it must have been Mr. Ballard, it was just so quick you couldn't tell what it was.

Q. All right, you know now it was Mr. Ballard?

A. Oh, yes.

Q. What did it look like to you at that time?

A. Well, it was just . . . just a form, it just happened so quick.

Q. What did you do?

A. Slammed my brakes on and went to the left. I thought I had missed him, then I heard that thump on the side of the car. I stopped just as quick as I could.

Q. What did you do then?

A. I ran back to Mr. Ballard and I said, 'Oh, Mr. Ballard,' and put my hat under his head, 'Mr. Ballard, I'm so sorry, I didn't see you in time to stop.'

Q. And did he say anything to you?

A. He said, 'I know you didn't, Mr. Pack,' he said, 'I know you couldn't help it, I didn't see you.' "

On cross-examination Mr. Pack testified as follows:

"Q. Mr. Pack, you were looking down the road and you were keeping your view up ahead of you for objects on the road?

A. Yes, sir.

Q. You have heard the testimony with reference to these lights and shadows on the road, do they have an impact or do they have some bearing on a person's ability to see?

A. They sure do.

Q. And a person in the shadows as cast by those poles, do they tend to hide him from a person traveling down the road?

A. I would say they do, they cast a shadow on the road, I would say they do.

Q. He wasn't any great distance on the road, was he, or was he actually on it?

A. It looked like about two or three feet over in the roadway to me.

Q. Well, do you actually know?

A. Well, it just looked like, I'm not sure, but it looked about two or three feet over in the road.

Q. And there was nothing to block your view of him as you approached that area, was there?

A. No, I don't know that there was."

In *Wilkerson* v. *McCarthy*, 336 U. S. 53, a switchman was injured in railroad yards when he slipped and fell into a wheel-pit while walking over the pit on a narrow board walk. The walk was constructed for the use of employees using the pit and switchmen had no occasion to use it. The railroad company did not know switchmen used the walk but there was evidence that employees other than pit crews did use the walk. There also was evidence that switchmen could easily go around the pit without crossing on the walk. The railroad company pleaded contributory negligence; the trial court directed a verdict in its favor and the Utah Supreme Court affirmed. In reversing the Utah Supreme Court on certiorari the United States Supreme Court said:

"There are some who think that recent decisions of this Court which have required submission of negligence questions to a jury make, 'for all practical purposes, a railroad an insurer of its employees.' See individual opinion of Judge Major, *Griswold* v. *Gardner*, 155 F. 2d

333, 334. But see Judge Kerner's dissent from this view at p. 337 and Judge Lindley's dissenting opinion, pp. 337-338. This assumption, that railroads are made insurers where the issue of negligence is left to the jury, is inadmissible. It rests on another assumption, this one unarticulated, that juries will invariably decide negligence questions against railroads. This is contrary to fact, as shown for illustration by other Federal Employers' Liability cases, *Barry* v. *Reading Co.,* 147 F. 2d 129, cert. denied, 324 U. S. 867; *Benton* v. *St. Louis-San Francisco R. Co.,* 182 S. W. 2d 61, cert. denied, 324 U. S. 843. And *cf. Bruner* v. *McCarthy,* 105 Utah 399, 142 P. 2d 649, cert. dismissed for reasons stated, 323 U. S. 673. Moreover, this Court stated some sixty years ago when considering the proper tribunal for determining questions of negligence: 'We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others.' *Jones* v. *East Tennessee R. Co.,* 128 U. S. 443, 445. And peremptory instructions should not be given in negligence cases 'where the facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences.' *Washington & G.R. Co.* v. *McDade,* 135 U. S. 554, 572. Such has ever since been the established rule for trial and appellate courts. See *Tiller* v. *Atlantic C.L.R. Co.,* 318 U. S. 54, 67, 68. Courts should not assume that in determining these questions of negligence juries will fall short of a fair performance of their constitutional function. In rejecting a contention that juries could be expected to determine certain disputed questions on whim, this Court, speaking through Mr. Justice Holmes, said: 'But it must be assumed that the constitutional tribunal does its duty and finds facts only because they are proved.' *Aikens* v. *Wisconsin,* 195 U. S. 194, 206."

In *Missouri Pacific R. Co. v. Eubanks, supra,* Mr. Eubanks was a brakeman engaged in a switching operation at Elaine, Arkansas. The night was dark but the weather was clear. Mr. Eubanks was standing on the front of an engine as it slowly proceeded onto a street crossing. A Mrs. Keene was approaching the crossing in her automobile and Mr. Eubanks flagged the oncoming car with his lantern and thought that the automobile had stopped. As the engine entered the intersection, Mrs. Keene drove her automobile into the front part of the engine striking and injuring Mr. Eubanks. Mr. Eubanks filed suit against Mrs. Keene and the railroad company alleging joint and concurring negligence; alleging that the railroad company failed to maintain a proper lookout; that signals were not given, and that proper care for Mrs. Keene's safety was not exercised after her peril was discovered or should have been discovered. A verdict was returned by a jury against Mrs. Keene in the sum of $2,500 and against the railroad company in the sum of $7,500. In reversing the judgment against the railroad, this court, in addition to the language quoted, supra, said:

"So here, if we were considering a suit by or against Mrs. Keene, the question of the failure to blow the whistle or ring the bell, thereby giving warning of the movement of the train, would be important, under common law principles, as ordinary care required that notice of the movement of the train be given by blowing the whistle or otherwise; but blowing the whistle or ringing the bell were not the only methods by which warning could be given. The undisputed testimony is that a warning which should have sufficed was given according to appellee's own testimony. The evidence appears therefore to be 'so overwhelming on one side as to leave no room to doubt what the fact is,' that the negligence of Mrs. Keene was the sole proximate cause of appellee's injury, there being no sub-

stantial evidence of negligence on the part of the railroad company contributing to the injury."

The United States Supreme Court granted certiorari and in 334 U. S. 854 reversed the decision of this court by Per Curiam which simply stated as follows: "The petition for writ of certiorari is granted and the judgment of the Supreme Court of Arkansas is reversed. See *Myers* v. *Reading Co.,* 331 U. S. 477, and *Ellis* v. *Union Pacific R. Co.,* 329 U. S. 649."

As was stated in *Eubanks* and also in *St. L. S. F. Ry. Co.* v. *Smith,* 179 Ark. 1015, 19 S. W. 2d 1102,

" 'Since this suit was brought and prosecuted under the Federal Employers' Liability Act, which does not define negligence, the question as to the sufficiency of the evidence to establish negligence must be determined by that act and the applicable principles of the common law as construed by the Federal Courts.' "

In *Anderson* v. *Atchison, T. & S. F. R. Co.,* 333 U. S. 821, a railroad conductor was injured when he fell from the rear vestibule of a train. The train traveled past three stations before other employees reported his absence and any attempt was made to find and rescue him. The conductor was taken to a hospital where he died three days later. His widow sued alleging negligence in the company's failure to search for the decedent within a reasonable period of time, and that as a result he died due to exposure to the cold weather from the time he fell until he was finally rescued. The trial court found that even if the allegations in the complaint were true, they were insufficient to support a judgment for plaintiff, and entered judgment for defendant. The state Supreme Court affirmed and on certiorari, the United States Supreme Court by Per Curiam opinion said:

"We are unable to agree that had petitioner been permitted to introduce all evidence relevant under

her allegations, the facts would have revealed a situation as to which a jury under appropriate instructions could not have found that decedent's exposure and consequent death were due 'in whole or in part' to failure of respondent's agents to do what a 'reasonable and prudent man would ordinarily have done under the circumstances of the situation.' *Tiller* v. *Atlantic Coast Line R. Co.,* 318 U. S. 54, 67. See also *Jamison* v. *Encarnacion,* 281 U. S. 635, 640, 641; *Bailey* v. *Central Vermont R. Co.,* 319 U. S. 350, 353; *Blair* v. *Baltimore & O. R. Co.,* 323 U. S. 600, 604; *Lillie* v. *Thompson,* 332 U. S. 459, 461-462."

In *Lillie* v. *Thompson,* 332 U. S. 459, the female petitioner for certiorari was employed in the respondent's railroad yards in Memphis. Her duties were to transmit orders to the various employees working in the yards. About 1 A.M. she opened the door of her office in response to a knock which she assumed to be one of the respondent's trainmen and she was attacked and beaten with a piece of iron by a person who was not an employee of the railroad company. She filed suit under the Employers' Liability Act alleging that the respondent was negligent in sending her to work in a place that they knew to be unsafe without taking reasonable measures to protect her. The District Court dismissed the complaint for failure to state a cause of action and entered summary judgment for the respondent. In reversing by Per Curiam on certiorari, the United States Supreme Court said:

"The district court stated, in explanation of its action, that there would be no causal connection between the injury and respondent's failure to light or guard the premises, and that the law does not permit recovery 'for the intentional or criminal acts' of either a fellow-employee or an outsider.

We are of the opinion that the allegations in the complaint, if supported by evidence, will

warrant submission to a jury. Petitioner alleged in effect that respondent was aware of conditions which created a likelihood that a young woman performing the duties required of petitioner would suffer just such an injury as was in fact inflicted upon her. That the foreseeable danger was from intentional or criminal misconduct is irrelevant; respondent nonetheless had a duty to make reasonable provision against it. Breach of that duty would be negligence, and we cannot say as a matter of law that petitioner's injury did not result at least in part from such negligence."

In *Lavender* v. *Kurn,* 327 U. S. 645, the petitioner's intestate was attending switches in the switch yards of the Grand Central Station in Memphis, Tennessee; it was a dark night and he was found near the track with a skull fracture from which he died. The evidence indicated that he had fallen forward and some indication that his feet had dragged a few inches southward as he fell. He sustained a gash in the back of his head with a corresponding black mark on the outside of a white cap he was wearing. It was the petitioner's theory that her intestate was struck by a mail crane swinging from a car and it was the respondent's theory that he was murdered. His gold watch and ring remained on the body but his wallet without money was found a few days later some distance from where his body was found. The ground was uneven in the area where the body was found and it appeared that it would have been necessary for the decedent to have been standing on one of the mounds in the area in order for a mail crane to strike him. It could have been inferred from the facts, however, that he could have been struck by a mail hook if he were standing on one of the mounds. In reversing a judgment against the railroad company, the Supreme Court of Missouri held that "all reasonable minds would agree that it would be mere speculation and conjecture to say that Haney was struck by the mail hook," and that "plaintiff failed to make a submissible case on that

question." It was ruled that there "was no substantial evidence that the uneven ground and insufficient light were causes or contributing causes of the death of Haney." On certiorari the United States Supreme Court reversed, stating:

"The evidence we have already detailed demonstrates that there was evidence from which it might be inferred that the end of the mail hook struck Haney in the back of the head, an inference that the Supreme Court admitted could be drawn. That inference is not rendered unreasonable by the fact that Haney apparently fell forward toward the main Frisco track so that his head was 5½ feet north of the rail. He may well have been struck and then wandered in a daze to the point where he fell forward. The testimony as to blood marks some distance away from his head lends credence to that possibility, indicating that he did not fall immediately upon being hit. When that is added to the evidence most favorable to the petitioner as to the height and swing-out of the hook, the height and location of the mound and the nature of Haney's duties, the inference that Haney was killed by the hook cannot be said to be unsupported by probative facts or to be so unreasonable as to warrant taking the case from the jury.

It is true that there is evidence tending to show that it was physically and mathematically impossible for the hook to strike Haney. And there are facts from which it might reasonably be inferred that Haney was murdered. But such evidence has become irrelevant upon appeal, there being a reasonable basis in the record for inferring that the hook struck Haney. The jury having made that inference, the respondents were not free to relitigate the factual dispute in a reviewing court. Under these circumstances it would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of wit-

nesses and arrive at a conclusion opposite from the one reached by the jury. See *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U. S. 54, 67-68; *Bailey* v. *Central Vermont R. Co.*, 319 U. S. 350, 353-354; *Tennant* v. *Peoria & P. U. R. Co.*, 321 U. S. 29, 35. See also Moore, 'Recent Trends in Judicial Interpretation in Railroad Cases Under the Federal Employers' Liability Act,' 29 Marquette L. Rev. 73.

It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or dis-believe whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

In the Arkansas case of *Missouri Pacific R. Co., Thompson, Trustee* v. *Keeton, Adm'x,* 207 Ark. 793, 183 S. W. 2d 505, (cert. granted 326 U. S. 689), the decedent brakeman fell from the front of a gravel car in a switching operation involving six cars of sand and gravel. The decedent was sitting astride the corner or the front car with one foot resting on the gravel and the other on a grabiron on the outside of the car. The allegations of the complaint were that the train stopped suddenly which jerked or caused the decedent to fall from the car. All of the train crew testified that there was no unusual jerk or jar in the operation and no sudden stop or quick

jerk at all. The appellee-widow testified that her husband, in a "dying declaration," told her that he was sitting on the corner of the car with his switch list in one hand and a light in the other; that there was a sudden stop and that after he was jerked off of the car he knew nothing more after the sudden hard stop and he was jerked off of the car. A judgment entered on a verdict for the widow was reversed by this court, on the grounds that there was no substantial evidence of negligence on the part of the railroad company. Justice Robins dissented because of the widow's testimony as to the dying declaration. The Supreme Court of the United States granted certiorari and reversed by Per Curiam opinion holding that the question of respondent's negligence should have been submitted to the jury.

In *Jenkins* v. *Kurn,* 313 U. S. 256, a fireman saw a standing train on a track in front of the moving train he was working on and he shouted to the engineer to apply the emergency brake. The engineer turned and looked at the fireman but did nothing. The fireman then rushed across the cab and stood behind the engineer for a brief time but said nothing. When the train was near collision with the stopped train, the engineer applied the brakes and the fireman jumped from the train landing in rocks and injuring himself. In his suit against the railroad the fireman alleged that he notified the engineer of imminent peril; that the engineer negligently failed to respond, thereby creating a dilemma of imminent peril which forced the fireman to jump from the train. A jury trial resulted in a verdict for $12,000 and judgment thereon. The Supreme Court of Missouri held that the railroad company's motion for a directed verdict should have been granted and in reversing on certiorari, the United States Supreme Court said:

"There was evidence from which the jury could have concluded that if not subject to any physical disability the engineer would have comprehended petitioner's monition and understood that peril was

imminent. Petitioner testified without contradiction that he 'hollered' his warning loudly; that only a narrow space separated his perch from the engineer's seat; that the engineer's hearing was 'all right'; that petitioner and the engineer could and did carry on 'normal conversations' while the train was operating; and that there was comparatively little noise in the cab from the train."

In *Larsen v. Chicago & N.W. R. Co.*, 171 F. 2d 841, the court said:

"Unless there is a complete absence of probative facts, Lavender v. Kurn, 327 U. S. 645, 66 S. Ct. 740, 90 L. Ed. 916, the question of whether defendant was guilty of negligence in furnishing a reasonably safe place to work was for the jury to determine from all the facts and circumstances. Bailey v. Central Vermont Ry., supra, 319 U. S. at page 353, 63 S. Ct. 1062, 87 L. Ed. 1444. And once there is a reasonable basis for concluding that there was negligence which caused the injury, it is irrelevant that fair minded men might reach different conclusions. In such cases the trial judge is not justified to substitute his conclusions for those of the jury. Lavender v. Kurn, supra, and Ellis v. Union Pacific R. R. supra, 329 U. S. at page 653, 67 S. Ct. 598, 91 L. Ed. 572. Bearing these principles in mind and applying them to our case, we believe there was a reasonable basis for concluding there was negligence which caused the injury, hence the trial court properly left it to the jury to say whether defendant was guilty of negligence in placing the caboose ahead of the pusher engine and whether plaintiff's injuries resulted in whole or in part from such negligence.

\* \* \*

. . . It also insists that the court erred in instructing the jury that the Federal Employers'

Liability Act provided that people working in the railroad business did not assume the risk of employment. We see no error in the instruction given."

In *Wantland* v. *Illinois Central R. R. Co.*, 237 F. 2d 921, the court said:

"In actions under this Act, the issue of the carrier's negligence is for the jury to determine and it is the jury's function to weigh the contradictory evidence and inferences, judge the credibility of witnesses and draw the ultimate conclusions as to the facts. Wilkerson v. McCarthy, 336 U. S. 53, 69 S. Ct. 413, 93 L. Ed. 497, rehearing denied 336 U. S. 940, 69 S. Ct. 744, 93 L. Ed. 1098. If the jury can find every fact exists which must exist to sustain the plaintiff's case and if the evidence on the issue of negligence is such that reasonable minds might differ on the question of whether the carrier has been negligent, the case is one for the jury. Frizzell v. Wabash R. Co., 8 Cir., 199 F. 2d 153, certiorari denied 344 U. S. 934, 73 S. Ct. 505, 97 L. Ed. 718.

\* \* \*

Only a complete absence of probative facts to support the verdict reached by the jury would justify this court in substituting its conclusions for those of the jury. Lavender v. Kurn, 327 U. S. 645, 652, 66 S. Ct. 740, 90 L. Ed. 916. We cannot say as a matter of law that the plaintiff was guilty of negligence which was the sole, proximate cause of this accident."

The above cited cases are by no means all the Federal Court decisions construing the Federal Employers' Liability Act as amended by 45 U. S. C. A. § 54 (1939), but they point up the general attitude of the courts "where such injury or death resulted in whole *or in part* from the negligence of any of the officers, agents, or employees of such carrier."

In the case at bar the 80% negligence attributed to Missouri Pacific seems out of all proportion to the negligence of Ballard and Pack under the evidence as we view the record; but, in *Mumma* v. *Reading Co.*, 247 F. Supp. 252, the plaintiff-employee was wearing rubbers over his regular work shoes and they became saturated with oil negligently spilled by his fellow-employees and through which he was required to walk in the performance of his duties. He was injured when he slipped and fell because of the oil on his rubbers. A jury made a finding of 45% contributory negligence. In approving the verdict the court said:

> "Thus, as to the second accident, there is at least some suggestion in the evidence that the plaintiff might have taken some additional precautions for his own safety. While the percentage of blame attached to plaintiff by the jury seems out of all proportion, that determination was nonetheless for the jury."

See also *Schulz* v. *Pennsylvania R. Co.*, 350 U. S. 523, a suit under the Jones Act, 46 U. S. C. A. § 688, where the District Judge directed the jury to return a verdict for the defendant, stating:

> "There is some evidence of negligence, and there is an accidental death. But there is not a shred of evidence connecting the two."

And where the Court of Appeals affirmed, saying that while the evidence was "perhaps at most only doubtfully sufficient to present a jury question as to defendant's breach of duty," it failed to show "where the accident occurred" or "that it was proximately caused by any default on the part of the defendant." But where the Supreme Court said:

> "In this case petitioner is entitled to recover if her husband's death resulted 'in whole or in part' from defendant's negligence. Fair-minded men could certainly find from the foregoing facts that

defendant was negligent in requiring Schulz to work on these dark, icy and undermanned boats. * * * Jurors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn."

See also *Stone* v. *N. Y., Chicago & St. Louis R. Co.,* 344 U. S. 407, where a section hand injured his back while helping to remove a crosstie from under the rails of the track, and in reversing the Missouri Supreme Court which had reversed a judgment of the trial court on a jury verdict in favor of the section hand; the United States Supreme Court said: "We think there was evidence of a causal connection between the order of Stouston to pull harder and petitioner's back injury."

In the case at bar there is little question that Ballard was safe from the hazard of traffic on the access road while he was standing near the switch he was attending in the proper performance of his assigned duties. The record does not reveal the distance between the switch Ballard was attending and the access road where he was injured, but there is no question that Ballard left the safety of his position near the switch and went to the access road where he was injured. According to the evidence pertaining to light poles, he walked at least eight feet toward the road. Whether Ballard walked backwards as testified by Thurman, or whether he walked forward as he testified, makes no difference.

There is no question that Ballard left his safe position near the switch and went to the access road where he was injured in response to a call from Thurman, and there is little question that Ballard would not have been injured if Thurman had performed his own duties as the yard master had directed. We hold that there was sufficient evidence of negligence on the part of Missouri Pacific through Mr. Thurman, to take the case to the jury.

The jury could reasonably have found that Mr. Thurman was negligent in parking his automobile across the access road from Ballard and shouting a question to Ballard under circumstances that would distract Ballard's attention from his assigned duties and cause him to come to the access road in order to understand the question over the noise of moving cars. The jury could have further found that as Pack approached Thurman's automobile on the narrow access road, he gave it a wide berth in anticipation of passengers alighting from Thurman's automobile rather than someone coming from the busy railroad tracks from across the access road to Thurman's automobile. We conclude that there is some substantial evidence to support the verdict and that the judgment must be affirmed.

The judgment is affirmed.

FOGLEMAN and BYRD, JJ., concur.